OPDYKE, d. b. a. LEDOGAR-HORNER CO., Plaintiff-Appellants,
v. SECURITY SAVINGS & LOAN CO. et al.,
Defendants-Appellees.
JERGER, Plaintiff-Appellant, v. SECURITY SAVINGS & LOAN
CO. et al., Defendants-Appellees.
SABIN, Plaintiff-Appellant, v. SECURITY SAVINGS & LOAN
CO. et al., Defendants-Appellees.

Ohio Appeals, Eighth District, Cuyahoga County.

Nos. 21963, 22014, 22016. Decided February 19, 1951.

258

Pennell, Carlson & Reese, Lockwood Thompson, Cleveland, for plaintiffs-appellants.

M. B. & H. H. Johnson, Cleveland, H. S. Duffy, N. Lancione, Columbus, for defendants-appellees.

## OPINION

By McNAMEE, J:

These appeals on law and fact apparently are the first cases of their kind to come before a reviewing court, if indeed they are not the first such cases to be instituted in any court. The reports of decided cases in Ohio and elsewhere disclose no previous attempt by dissenting shareholders of a State Savings and Loan Association to enjoin the consummation of a plan of the majority to convert the corporation into a Federal Association. Hopkins Savings & Loan Assoc. v. Cleary, 296 U. S. 315, involved actions instituted by the State of Wisconsin to prevent the conversion of three State chartered Associations into Federal Associations without the consent of the State, but as expressly noted in the opinion of the Supreme Court, the dissenting shareholders were not parties to those actions.

Not only is this litigation primordial, but it presents important questions touching the subjects of statutory construction and corporate and constitutional law.

The defendant, Security Savings & Loan Association, was organized in 1916. By the year 1949 it had grown to substantial size and strength. The capital of the company on August 8, 1949 amounted to approximately $200,000.00 consisting of more than 1800 shares of permanent capital stock and about 47 shares of running stock. Each share was of the par value of $100.00. The deposits of the Association were in excess of $7,343,000.00, the major portion of which were insured by the Federal Deposit Insurance Corporation.

According to plaintiffs, the book value of each share, including reserves and undivided profits, was about $372.00. Per share earnings for the year 1948 were $22.79 and for the first six months of 1949 the corporation earned $13.39 per share. Notwithstanding its substantial earnings in those years the corporation was unable to pay dividends in excess of $3.00 per share. This limitation of distributable earnings resulted from the regulations of the Federal Deposit Insurance Corporation which required the maintenance of specified ratios between deposits and capital and between a total of capital and reserves as against deposits, which the corporation was unable to maintain. Because the ratios were below the designated proportions, the company was required to allocate twenty percent of its earnings to reserves before computing interest on savings accounts. Thus, in 1948, the corporation's earnings before computing interest on deposits, were in excess of $177,000.00. Twenty percent of this amount, or approximately $35,000.00 was allocated to the reserve fund and after crediting interest on deposits there remained but $7200.00 of net profits available for distribution as dividends. Of this amount $6000.00 was paid in dividends and the balance of $1200.00 placed in the. undivided profits fund.

In the eight years prior to 1948, the Association paid dividends in varying amounts between $1.00 to $2.50 per share. For several years prior to 1940 no dividends were paid. The market price of the stock ranged from a low of $15.00 per share in the 1930's to a high of about $100.00 per share except in the case of occasional sales at a higher price made under the influence of special factors.

Under date of July 15, 1949, the Security Savings & Loan Association notified its stockholders of a special meeting to be held on August 8, 1949, for the purpose of voting upon a plan to convert the corporation to a Federal Savings & Loan Association. Among other things, the plan provided for con-

verting each share of $100.00 par value stock into a withdrawable share account in the amount of $135.00. At the time of the notice of the special meeting, plaintiff Opdyke, in case No. 21963, was the owner of 182 shares of stock. Between the date of the notice of the meeting and August 8, 1949, Opdyke and his partner in the brokerage business, Schulte, doing business as Ledogar-Horner Company, purchased an additional 407 shares with their proxies, at a price of $160.00 per share. These shares were purchased pursuant to a special offer made by plaintiffs to all stockholders. During this period also, plaintiffs in Case No. 21963, opposed the plan of conversion in letters sent by them to all stockholders

At the meeting on August 8, 1949, more than fifty-one percent of the shares cast were voted in favor of the plan of conversion. Plaintiffs in case No. 21963 then commenced suit in Common Pleas Court.

In their petition, plaintiffs set forth three causes of action, in the first of which they asked the Court to enjoin the consummation of the plan on the ground (a) that the plan is inequitable; (b) that it was fraudulently promoted; (c) that it is illegal.

In their second cause of action, plaintiffs as dissenting shareholders, seek in the alternative to obtain the fair cash value of their shares, claiming to be entitled thereto under the provisions of §8623-72 GC and §693-1 GC.

The third cause of action avers that if relief be denied the plaintiffs on the first two causes of action, then the plan of conversion, and §9660-2 GC under which it is sought to be accomplished, are unconstitutional.

A separate appeal in case No. 22014 is taken by plaintiff, Etta Jerger, who is the owner of 21 shares of stock issued to her father in 1917 and 1918, the title to which passed to plaintiff by inheritance in 1939. In appeal No. 22016, plaintiff, Orrin Sabin, is the owner of five shares of stock acquired by purchase in 1930. In the last two mentioned cases, the plaintiffs make no claim similar to those set forth in the first cause of action in Case No. 21962, but as dissenting shareholders they seek to obtain the fair cash value of their stock and assert further that if such relief be denied the plan of conversion must be held unconstitutional, as constituting a taking of plaintiffs' property without due process of law and impairing the obligations of their contracts as shareholders.

Counsel for the respective parties have submitted extensive and well reasoned briefs which have been supplemented by oral argument. A brief, amicus curiae, has been filed by counsel for the Ohio Savings & Loan League and we have been

favored with copies of the able and exhaustive opinion of the trial judge. Being in agreement, generally, with the conclusions reached by the Common Pleas Court, we deem it unnecessary to duplicate here the detailed exposition of facts and arguments, the copious citation of authorities and the quotation of lengthy pertinent statutes that appear in the opinion of the trial judge.

In respect of the claim of fraud that is made in the first cause of action in case No. 21963, it is sufficient to observe that we find the claim to be without substance. There is no evidence that any shareholder who voted for the plan was misled by the alleged misrepresentation or suppression of facts.

The claim of illegality is likewise devoid of merit. The procedure adopted to accomplish conversion was in strict compliance with the provisions of §9660-1 GC and §9660-2 GC, and the applicable provisions of the Home Owners Loan Act of 1933 and the rules and regulations of the Federal Savings and Loan System.

Sec. 9660-2 GC, provides in part:
* * *

"2. At such meetings a resolution to convert as aforesaid shall be adopted as provided in the Home Owners Loan Act of 1933 and amendments thereto."

The pertinent provisions of the Home Owners Loan Act of 1933 are set forth in U. S. C. A. Title 12, Sections 1461 to 1468, inclusive and paragraph (i) of Section 1464 reads:

"(i) Any member of a Federal Home Loan Bank may convert itself into a Federal Savings and Loan Association under this chapter upon a vote of fifty-one percentum or more of the votes cast at a legal meeting called to consider such action; but such conversion shall be subject to such rules and regulations as the Board may prescribe and thereafter the converted association shall be entitled to all the benefits of this section and shall be subject to examination and regulation to the same extent as other associations incorporated pursuant to this chapter."

Whatever may be thought of the provisions permitting a conversion upon an affirmative vote of fifty-one percent of the votes cast at a meeting rather than requiring a majority or higher percentage of the outstanding shares, this court cannot disregard the plain and obvious import of legislative language that is clear and free from doubt. Although the vote

at the meeting of August 8, 1949 was relatively close, it is beyond dispute that more than fifty-one percent of the votes cast were registered in favor of conversion and that result cannot be changed by assuming the plan of conversion to be the equivalent of other corporate changes authorized under different sections of the General Code which require a higher percentage of votes of the outstanding shares as a prerequisite to their consummation.

Sec. 9660-2 GC authorizes a domestic savings and loan association to do that which can be accomplished under no other section of the General Code. That certain aspects of conversion as there authorized bear marks of similarity to other corporate changes such as reorganization, sale of assets, amendments to corporate charters or dissolution, is no warrant for considering a conversion to be the equivalent of any of these other procedures.

A reorganization as authorized by §693-1 GC which requires a vote of fifty-one percent of the outstanding stock contemplates the reorganization of an association that will thereafter continue in business under a State charter. This is true also of §8623-15 GC, authorizing under the General Corporation Act. In a conversion under §9660-2 GC there is no sale of assets as contemplated by §8623-65 GC. The converting association as a corporate entity receives no consideration for its assets from the successor Federal institution. The requirements of §8623-65 GC of an affirmative vote of two-thirds of the outstanding shares can have no application here. Nor is conversion tantamount to a dissolution of the State Association within the meaning of that term, as used in the corporation's constitution which requires a vote of fifty-one percent of the outstanding stock to effect a dissolution. It is true that §9660-2 GC provides that upon its conversion to a Federal Savings & Loan Association the

"corporate powers of the association under the laws of this state shall cease to exist * * * and that its shares of incorporation shall be deemed to be cancelled and annulled."

Sec. 9660-2 GC, also provides that the powers and authority of the Superintendent of Building & Loan Associations over and with respect to the property of a converted corporation shall cease. These provisions are efficacious to terminate the jural existence of a State corporation, but they do not operate to cause its functional demise. The corporation continues in business as a Savings and Loan Association. With the permission of the State that created it, and for the benefit of

the people thereof, the Association continues to serve its original purpose under the aegis of the Federal Government. The Association as converted, continues to live and function. This is not dissolution. That term imports an end to corporate life together with a definitive cessation of corporate activity.

Plaintiffs assail the plan of conversion as being inequitable to the stockholders in that it provides that each shareholder shall receive a withdrawable share account in the converted association in the amount of $135.00 for every share of stock held in the State institution. The officers of the Security Savings & Loan Association endeavored to obtain a conversion price of $150.00 per share but the Federal Home Loan Bank refused to approve a price in excess of $135.00. The association as converted will be a mutualized Federal Association with no shareholders and a withdrawable share account in the amount of $135.00 is the equivalent of a deposit in that amount.

The conversion price of $135.00 per share was determined by the Federal Home Loan Bank as a result of allocating five percent of the corporation's total assets to reserves and two percent of the assets to the undivided profits fund. Plaintiffs complain that this method was arbitrary and fails to give effect to the true value of the stock as reflected by its book value and potential earning power.

A Savings and Loan Association is a quasi-public institution engaged in the important business of receiving money on deposit. The interest of the depositors is paramount to that of the shareholders. Manifestly it was the duty of the Federal Home Loan Bank in approving the terms of a proposed conversion first to provide those financial safeguards best calculated to insure the safety and financial integrity of the converted association at all times. The Federal Home Loan Bank discharged its duty in this regard by providing for the allocation of assets to reserves and undivided profits in the indicated proportions. It has not been shown, nor is it claimed, that the percentage of assets allocated to reserves and undivided profits is unwarrantably high. Nor has it been demonstrated that the measure of financial safety thereby achieved can be maintained if the conversion price of the stock is increased above $135.00 per share.

In view of this, there exists no basis for a judicial determination of discrimination against the stockholders.

Plaintiffs' claim that book value and earning power of the stock are controlling factors in determining its value for purposes of conversion, is unsound. The book value per share as estimated by plaintiffs is more than $370.00. Their com-

putation discloses also that included within this amount is a per share value of reserves in the amount of $178.35. These reserves, though substantial when computed on a per share basis, are insufficient to maintain the ratios between the reserves and deposits required by the Federal Deposit Insurance Corporation. Because of this there exists the necessity of allocating an unusually high percentage of annual earnings to the reserve fund. Under these circumstances the reserve fund which is designed primarily to afford depositor protection, is a sterile element of the book value of the stockholders shares.

If comparative tests have any probative value in determining the fairness of the conversion price of $135.00 per share, that figure must be considered in relation to dividends, both past and prospective. On this basis the conversion price of $135.00 is not only adequate but fairly may be considered as high. As compared with its market value over the years the price also must be considered as fair. But of manifestly greater persuasiveness of the fairness of the conversion price are these factors:—the conversion price was determined in the first instance by a disinterested impartial government agency;—it was accepted as fair by the management of the Security Savings & Loan Association;—and in the face of vigorous opposition by the plaintiffs, its fairness was approved by those voting a majority of shares cast at the meeting of August 8, 1949. Whether continuance in business as a state charter would result in superior financial advantage to the shareholders can be of no concern to this Court. As remarked in **Cleveland Cliffs Iron Co. v. Anderson, 40 O. O. 130:**

"Courts possess no veto powers over the purely business judgment of corporate officers or stockholders."

We are unable to find that the plan is inequitable to the stockholders of The Security Savings & Loan Association.

As dissenting shareholders, plaintiffs in all three cases claim to be entitled to the fair cash value of their stock, to be determined as provided in §8623-72 GC. This claim rests upon three grounds:

(1) That §9660-2 GC being silent on the subject of dissenting shareholders' rights the court must apply either §693-1 GC, which expressly grants such rights upon the reorganization of a savings and loan association, or those subsections of the General Corporation Act that confer such rights upon the contingencies of major corporate changes.

(2) That the language of §9660-2 GC which preserves sub-

stantive rights generally must be considered as preserving to plaintiffs their appraisal rights as dissenting shareholders.

(3) Upon the facts of these cases, plaintiffs' appraisal rights as dissenting shareholders exist independently of any statute. We shall consider these claims in the order stated.

(1) **Sec. 8623-72 GC** provides in part:

"Dissenting shareholders. Unless the articles otherwise provide, any dissenting shareholder who shall not have voted in favor of the proposals herein mentioned and by the provision of any section of this act (§8623-1 to §8623-188 GC) is entitled to relief when the Articles of Incorporation have been amended, or when all or substantially all of the property and assets of the corporation have been authorized to be sold, leased, exchanged, or otherwise disposed of, or when a consolidation or reorganization of the corporation has been authorized, shall be paid the fair cash value of his shares as of the day before the vote was taken authorizing any such action, excluding from such fair cash value any appreciation or depreciation in consequence of the consolidation or other matter which entitled him to such relief * * *."

It will be noted that the rights conferred by this section are limited to a dissenting shareholder who "by the provisions of any section of this Act (§8623-1 to §8623-138 GC) is entitled to relief" when one or more of the major corporate changes therein described has been effected. The provisions of the General Corporation Act referred to in §8623-72 GC are §8623-14 GC (Amendments), §8623-15(a) GC (Reorganization), §8623-65 GC (Sale of Assets), §8623-67 GC (Consolidation or Merger). In each of these sub-sections of the General Corporation Act there is an express and explicit grant of appraisal rights to dissenting shareholders. These sections, as well as §8623-72 GC, must be considered in the light of §8623-132 GC, which in part provides:

"Special provisions for Certain Corporations: in cases where special provision is made in the General Code for the incorporation, organization, conduct or government of any class of corporations, **such special provision shall govern to the exclusion of the provisions of this act on the same subject,** unless it clearly appears that the special provision is cumulative, in which case the provisions of this act also shall apply." (Emphasis ours.)

Special provisions governing the incorporation, organization and conduct of savings and loan associations are set forth in the chapter including §9643 to §9674-3 GC. Included within this chapter are §9660-1 and §9660-2 GC which are the only sections of the General Code governing the conversion of state savings and loan associations into federally controlled institutions. These special provisions are not cumulative of any provision to be found in the General Corporation Act. Therefore, the legislative directive contained in §8623-132 GC applies and "such special provisions shall govern to the exclusion of the provisions * * *" of the General Corporation Act. This being so, the provisions of the General Corporation Act which authorize major corporate changes and expressly confer appraisal rights upon dissenting shareholders may not be considered in determining whether dissenting shareholders possess such rights under the exclusively applicable provisions of §9660-1 and §9660-2 GC.

Sec. 693-1 GC authorizes a reorganization of a savings and loan association and specifically provides for appraisal rights of dissenting shareholders to be exercised in the manner provided for in §8623-72 GC. As hereinabove noted, §693-1 GC, contemplates and provides for a reorganization of a savings and loan association that will continue to do business under a state charter.. This section can have no application to a conversion accomplished under §9660-1 and §9660-2 GC.

Sufficient to distinguish a conversion under §9660-1 and §9660-2 GC, from all other forms of corporate changes is the distinctive and unique result accomplished thereby. Conversion effects a transmutation of a state corporation to one under the exclusive control of the Federal Government. To accomplish this result the converting corporation must not only comply with State law but also with the laws of Congress and the regulations adopted pursuant thereto, and in addition, the approval of the designated Federal fiscal agency must be obtained. That a conversion may, in some of its characteristics and effects, bear a resemblance to a "reorganization" or a "sale of assets" may be of academic interest but this furnishes no warrant for importing into §9660-1 and §9660-2 GC the provisions of statutes that authorize essentially different corporate changes. Secs. 9660-1 and 9660-2 GC are complete, exclusive and controlling in all matters pertaining to the conversion of a State savings and loan association to a Federal association.

(2). Sec. 9660-2 GC outlines in detail the procedure necessary to effect a consummation of a plan of conversion. Among other things it provides that all of the property and assets

of the State association shall, without conveyance, pass to and vest in the successor Federal corporation, subject to all liens against said property existing at the time of the conversion. This section also requires an assumption of all "debts and liabilities" of the State association by its Federal successor and further it is provided therein that:

"Nothing herein shall be held or construed to deprive any person, firm or corporation of any substantive right theretofore existing against such association, nor of the right to enforce the same by appropriate proceedings against the property and assets transferred by option of this paragraph, in the event and to the extent that such substantive right shall not be satisfied or adjusted by the successor federal savings and loan association in accordance with its charter or the resolution of assumption hereinbefore required."

It is plaintiffs' view that the "substantive rights" referred to in the above quoted language include appraisal rights of dissenting shareholders. But unless the quoted language be efficacious to confer, as well as to preserve, appraisal rights of dissenting share holders the argument must fail. It has been the settled and undeviating legislative policy of this state to confer dissenting shareholder rights in connection with a grant of authority to effect major corporate changes and to grant such rights in terms so explicit and clear as to admit of no uncertainty of legislative intent.

In the numerous sections of the General Code, including §693-1 GC, and relevant sub-sections of the General Corporation Act, as well as sections of the General Code relating to banks and railroads, there are express and definite provisions conferring appraisal rights upon dissenting shareholders. Not so with §9660-2 GC. This section makes no express reference to or mention of dissenting shareholders' rights. This omission is significant. It is the basic canon of statutory construction that legislative intent is to be ascertained from the language used in the statute. "The law does not concern itself with the legislature's unexpressed intention." **37 O. Jur. 524, 525, Sec. 281.**

The manifest legislative purpose expressed in the above quoted language of §9660-2 GC is the preservation of existing substantive rights against the converting corporation. No new substantive rights are created. Inasmuch as §9660-2 GC confers no rights upon dissenting shareholders, and no other statute authorizing a major corporate change has application,

it must be held that "substantive rights" as those words are used in the preservation clause of §9660-2 GC do not include appraisal rights of dissenting shareholders.

(C) Plaintiffs in case No. 21962 urge with great vigor that appraisal rights of dissenting shareholders exist independently of statutes. In their reply brief they assert:

"It is plaintiffs' contention that rights as dissenting shareholders existed before the passage of any statute thereof, exist parallel to the statutes at this moment, and must exist outside of the statute if the statutes can not be construed to grant them."

Plaintiffs claim too much. Before the enactment of statutes granting appraisal rights to the dissenting shareholders the rule of unanimity applied and it was within the competence of a dissenting shareholder to prevent a major corporate change except by unanimous action of the shareholders. In most cases where the rule of unanimity was abolished by the legislature, dissenting shareholders were given rights to receive the fair cash value of their stock. Statutes permitting radical corporate changes by a vote of less than all the shareholders and conferring appraisal rights upon the dissenters became a part of the shareholders' contract with the corporation.

A corporation is a creature of the state and the terms of a contract between a shareholder and a corporation must be such as are authorized by law. A dissenting shareholder's rights like all other rights of shareholders, have their origin in the shareholder's contract with the corporation. They derive from no other source. If statutory provisions authorizing major corporate changes confer no appraisal rights upon dissenting shareholders, such statutory provisions become a part of the shareholder's contract and he is bound thereby. Appraisal rights of dissenting shareholders are not the inevitable concomitant of statutory authority to effect major corporate changes. The state may grant or withhold these rights, subject always to the constitutional guaranties that protect a shareholder against confiscation of his property or infringement of his vested rights.

In Fletcher on Corporations, Vol. 13, pages 263, 264, Sec. 5906, the author says:

"Of course a dissenter has no right to demand payment of the value of his stock where there is no statute providing therefor, if the act complained of was in all respects legal."

See also: Mayfield v. Allen Ry. Gas & Elec. Co. 198 Ill. 525, 65 N. E. 100.

Ordinarily appraisal rights are granted to dissenting shareholders as a protection against the unjust use of the coercive power of the majority. In the case of a conversion from a State to a Federal savings and loan association, the reasons that warrant a grant of appraisal rights to dissenting shareholders are not present. In every other corporate change, except conversion under §9660-2 GC, the majority shareholders continue to be stockholders in the corporation effected or, as in consolidations or mergers the approving majority become shareholders in the new State corporation created thereby. In all such cases the minority stockholders have the option of remaining with the majority or withdrawing from the corporation and obtaining the fair cash value of their shares. But a much different situation obtains under a conversion from a State to a Federal savings and loan association. By virtue of such conversion, all shareholders, majority and minority alike, cease to be stockholders in the State association and do not acquire any equity interest in the successor Federal corporation. Because of this, provision is made in the Federal savings and loan association regulations for the payment in withdrawable share accounts to all shareholders of the State association of the present value of their stock.

Section 202.24 of the Federal Savings and Loan System Regulations, provides in part:

"Plan of Conversion. The plan of conversion which shall be voted upon by the shareholders of the applicant must provide among other things as follows:

"(d) All holders of guarantee, permanent, reserve fund, or other nonwithdrawable capital stock shall be given share accounts of the Federal association of an aggregate value equivalent to the present value of their stock, after provision for appropriate reserves, as determined by the Board."

In all cases where appraisal rights are granted to dissenting shareholders, the fair cash value of their shares is determined by an impartial board of appraisers as provided in §8623-72 GC. Where conversion is consummated under §9660-2 GC an impartial Federal fiscal agency determines the present value of the shares of all stockholders as directed in the Regulation quoted above, and this determination in turn is subject to the approval of the specified majority of shares.

In determining the fair cash value of shares under §8623-72 GC, the appraisers must ascertain their value as aliquot shares of a going business.

As stated in Condon v. Cleveland Cliffs Iron Co. Cuyahoga County Common Pleas Court No. 582990:

"The shares are to be valued as those of a going concern contemplating a continuance in business. While the intrinsic value of the shares is to be determined 'from the assets and liabilities in the light of every factor bearing upon value' this rule does not exclude consideration of general economic uncertainties and the risks and hazards peculiar to the particular business involved."

The "present value" of a permanent stock in a converted savings and loan association is the going concern value of the shares after "appropriate provision" is made for reserves. The requirement in Sec. 202.24 of the Federal Savings and Loan Regulation that appropriate provision for reserves be made by the Board before determining the "present value" of the stock, is not in violation of the due process clause, nor does such requirement infringe upon any vested interest of a stockholder. In view of the quasi-public nature of a savings and loan association, it is within the power of the controlling Federal agency, acting with the consent of the State, to provide reserves in an amount adequate to insure the economic stability of the converted association. A shareholder who dissents from a plan of conversion may seek relief in a court of equity against an unfair valuation of the present worth of his stock, resulting from an allowance of a disproportionate amount of the assets as reserves or other unfairness. But in view of the provisions for the ascertainment of the value of the shares of all stockholders by an impartial governmental agency, it is not difficult to understand the absence in §9660-2 GC of a provision granting dissenting shareholders additional appraisal rights.

The constitutional issue raised by plaintiffs requires but brief comment. Secs. 9660-1 and 9660-2 GC do not impair the obligations of plaintiffs' contracts as shareholders, nor deprive them of their property without due process of law.

Article 13, Sec. 2 of the Constitution of Ohio provides:

"Corporation may be formed under general laws. But all such laws may, from time to time, be altered or repealed * * *."

This constitutional reservation of power is effective to permit amendments to corporate charters and to alter the terms

of the contract between the shareholders and the corporation and the contracts between shareholders.

Allen v. Scott, 104 Oh St 436; Harbine v. Dayton Malleable Iron Co., 61 Oh Ap 1; Looker v. Maynard, 179 U. S. 46; Wright v. Minn. Mutual Life Ins. Co. 193 U. S. 657; Polk v. Mutual Reserve Fund L. Assoc. 207 U. S. 310.

The Security Savings & Loan Association was organized in 1916. Secs. 9660-1 and 9660-2 GC, were adopted by the General Assembly in 1934 as emergency legislation. The purpose of these sections is to enable State savings and loan associations to take advantage of the financial aid afforded such institutions by the Federal Government. Plaintiffs in case No. 21963 acquired their shares subsequent to the enactment of §9660-1 and §9660-2 GC. They may not complain.

In Kirby v. Saginaw Hotels, 253 Mich. 308, the court said:

"Passing the question of the authority of the legislature under its reserved power (Art. 12, Sec. 1, State Constitution) to alter, amend, repeal or abrogate all rights, privileges, or franchises of a corporation, we consider whether plaintiff may complain, having acquired her stock after the legislature had conferred on the corporation the right of consolidation. Under the weight of authority she may not."

In case No. 22014, plaintiff's predecessor in interest acquired his stock prior to the enactment of §9660-1 and §9660-2 GC. Orrin Sabin, plaintiff in case No. 22016, also acquired his stock prior to 1934. But by their contracts which included Art. 13, Sec. 3 of the State Constitution, these plaintiffs are bound by the amendment to the Corporation's Charter effected by the enactment of §9660-1 and §9660-2 GC.

In Germer v. Gas & Oil Co., 60 W. Va. 143, the court said:

"The broad reservation to the legislature 'to amend, alter or repeal' the provisions of the statute under which corporations operate are as though written into every charter issued thereunder and every subscriber to the stock of any such corporation is charged with full knowledge of the provisions of the law then existing under which the legislature might, at any time, amend, alter or repeal the provisions of the law which were so made a part of the charter, and such subscriber must be held to have given his consent that such change might at any time be made by the legislature. This being true, it cannot be claimed with good reason that by such action the legislature would be impairing the obligation of any contract the subscriber entered into when he became a stockholder * * *."

There can be little doubt that §9660-1 and §9660-2 **GC** being enacted pursuant to the constitutionally reserved power of the state, are a part of the shareholders' contracts and that the plan of conversion was adopted in conformity with the shareholders' contracts and cannot be considered as impairing any of the obligations thereof.

Provision having been made for the payment to the stockholders of the "present value" of their shares, there is no taking of any stockholder's property without due process of law.

Plaintiffs repeatedly, throughout their briefs and in oral argument, refer to and stress the concurring opinion of Turner J., in **Roessler v. Security Savings & Loan Assoc., 147 Oh St 480**, as authority for the proposition maintained by them that "there is and always has been, and always ought to be, a substantive right in a stockholder to the fair value of his stock as against persons who have no financial interest therein—in this case the depositors."

In his concurring opinion in the Roessler case, Turner J., said:

"I concur in the reasons given for the decision in the majority opinion but I place my concurrence in the judgment on the further ground that inasmuch as the appellee corporation was one incorporated prior to the enactment of the General Corporation Act, and inasmuch as there was no provision in the articles of incorporation or otherwise to the contrary, a dissenting shareholder is entitled to the intrinsic value of his shares in the absence of an agreement when the majority of the shareholders authorize a consolidation of the corporation with another corporation. To hold otherwise would be to impair the obligation of contract between the shareholder and the corporation and to deprive the shareholder of due process of law."

Considered in the light of the issue decided and the majority opinion, Judge Turner's language cannot be interpreted as meaning that a statute authorizing a major corporate change but which confers no appraisal rights upon dissenting shareholders would be unconstitutional.

In the Roessler case the shareholders' contracts which included §8623-67 **GC** and §8623-72 **GC** as applicable statutory provisions conferred appraisal rights upon dissenters in the event of a merger or consolidation. These appraisal rights entitled the dissenting shareholders to an award equal to the fair cash value of their shares. Judge Turner indicated his

view that an award of any amount less than the "intrinsic value of the shares" would be in violation of the shareholders' contracts and constitute a taking of property without due process. This squares with the majority opinion in the Roessler case which holds that "fair cash value" is the "intrinsic value" of the shares.

The expressions of the court in its opinion in **Wildermuth v. Coal & D. Co. 138 Oh St 1,** likewise do not tend to sustain the proposition here contended for by plaintiffs. Nor do **Wheatley v. A. I. Root Co. 147 Oh St 127,** and **Shaffner v. Iron Co. 150 Oh St 454** afford any assistance to plaintiffs. These cases involved attempts by the majority to apply amendments to the corporate charter retroactively, the effect of which was to destroy the vested rights of preferred stockholders to cumulative dividends that had theretofore accrued.

It would profit little to further extend this opinion by a discussion of the many authorities from other jurisdictions cited and relied on by plaintiffs. We do not find these authorities to be applicable. Nor do we deem it necessary to comment upon defendants' argument on the subject of the police power as furnishing ample warrant for the enactment of §9660-1 and §9660-2 GC.

We hold that it is competent for the State, acting within its constitutionally reserved power to consent to and provide for the conversion of a State savings and loan association into a Federal savings and loan association. Further that §9660-1 and §9660-2 GC, which are designed to accomplish this result are exclusive, complete and controlling and are not repugnant to the provisions of the State or Federal constitutions.

For the reasons hereinabove stated, a decree may be entered for defendants, upon the issues joined in all three cases. O. S. J.

SKEEL, PJ, HURD, J, concur.