CITY OF CLEVELAND et al., Appellants,

v.

CLEVELAND ELECTRIC ILLUMINATING COMPANY, Appellee.

[Cite as *Cleveland v. Cleveland Elec. Illum. Co.* (1996), 115 Ohio App.3d 1.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 69584.

Decided Sept. 30, 1996.

2

4

*Sharon Sobol Jordan,* Director of Law; *Climaco, Climaco, Seminatore, Lefkowitz & Garofoli, Co., L.P.A., Richard M. Knoth* and *Jayne L. Jakubaitis; Chester, Willcox & Saxbe, John W. Bentine* and *Charles Rockwell Saxbe,* for appellants.

*Sally L. Geib, Gregory A. Cada* and *Michael C. Regulinski,* Independence, for appellee.

KARPINSKI, Judge.

Plaintiffs-appellants, city of Cleveland and American Municipal Power–Ohio ("AMP–Ohio"), appeal from the judgment of the trial court dismissing the case for lack of jurisdiction. Plaintiffs filed their complaint for declaratory and injunctive relief against defendant-appellee, Cleveland Electric Illuminating Company ("CEI"). The dispute arose when CEI refused to commit to transmitting a guaranteed level of power as requested by Cleveland Public Power ("CPP") for the month of June 1995. The reason CEI gave for refusing was that one of its generating facilities was not operational because of repairs. Dismissing the complaint, the lower court apparently reasoned that the dispute was under the exclusive jurisdiction of the Federal Energy Regulatory Commission ("FERC"). For the reasons that follow, the judgment of the lower court is reversed and remanded.

According to plaintiffs' brief, AMP–Ohio is a "not-for-profit Ohio corporation which is comprised of 77 Ohio municipalities that own and operate municipal electric utilities. AMP–Ohio supplies power and energy to some of its members, including CPP, and acts as agent for its members by acquiring power and energy as well as arranging for the transmission of the supplies to its member municipalities. AMP–Ohio serves as both a direct seller of power to its members and as an agent for the municipalities in arranging wholesale purchases of power and the subsequent transmission of power."

CPP, which is a member of AMP–Ohio, is a municipal utility company owned and operated by the city of Cleveland. CEI is a privately owned utility company which generates electrical power. While CPP purchases some power (five percent) from CEI, the bulk of CPP's power (ninety-five percent) is purchased

from sources other than CEI and sent to CPP through CEI transmission lines—a process known as "wheeling." Because CPP is surrounded by CEI's system, CPP is dependent upon CEI for transmission of power. For this wheeling service, CPP pays a service fee to CEI, which is the owner of the transmission lines used to wheel the electrical power.

CPP and CEI have experienced a litigious history together. In 1979 the Nuclear Regulatory Commission found that CEI committed antitrust violations. The NRC approved the licenses for the Davis–Besse and Perry nuclear power plants on the condition, *inter alia*, that CEI wheel power to various municipally owned utilities, including CPP. *Toledo Edison Co.* (1979), 10 NRC 265, at 398–401 and 406. The current agreement under which CEI provides power to CPP is the "CEI–Cleveland Agreement for Installation and Operation of a 138 kV Synchronous Interconnection" dated October 18, 1985.

The heart of this dispute is CPP's request for a commitment by CEI to transmit, on a firm basis, power generated by other utility companies.[1] In June 1994, CPP reserved seventy-two megawatts ("MW") of firm transmission service. In May 1995, CPP requested, and CEI agreed to provide, one hundred twenty-five MW of firm transmission service. Later, on May 11, 1995, CPP requested an additional sixty-two MW of firm service. Thus, the total requested firm transmission service was one hundred eighty-seven MW.

CEI informed CPP that it would provide twenty-five MW of the additionally requested sixty-two MW on a firm basis. This would leave thirty-seven MW of the requested one hundred eighty-seven MW on a nonfirm basis. CEI claimed that the denial to provide the last thirty-seven MW on a firm basis was for only five weeks because one of its power-generating facilities, Ashtabula # 5 Unit, was out of service.

CPP argues that the following portion of the October 18, 1985 agreement is central to this dispute. Section 3(a) of this agreement states as follows:

"TECO [Toledo Edison Company] and CEI shall each engage in wheeling under appropriate tariffs and at the request of AMP–O and its members, as long as such requested wheeling is not to a retail customer, and such wheeling shall be provided on a daily, weekly, monthly or annual basis at the request of AMP–O or its members. TECO and CEI further agree that such wheeling service shall be available with respect to any unused capacity on the transmission lines of either, the use of which will not jeopardize the utility's transmission system. *In the event that a reduction in wheeling service due to lack of capacity becomes*

---

1. "Firm" service is a constant uninterrupted obligation to provide energy. "Non-firm" service is subject to interruption if the obligations exhaust the resources of the company providing the energy.

*necessary, reductions in service will be made to AMP–O or its members on a non-discriminatory basis subject to constraints imposed by actual operating conditions.* It is also understood that TECO's and CEI's obligations to wheel power pursuant to this paragraph of the agreement include the provision for transmission service into, out of, or through their service territories, including between points wholly within the service territory of either of them." (Emphasis added.)

CPP contends that the refusal to provide the entire requested firm service amounted to a reduction on a discriminatory basis prohibited by the agreement. CPP argues that the refusal to provide the requested amount is discriminatory because, in the event the amount of production is lessened, the reduction in service will be borne entirely by CPP and its customers. CEI counters that this dispute is controlled by certain tariffs, as opposed to the agreement.[2]

On May 31, 1995, CPP filed a complaint in common pleas court seeking injunctive and declaratory relief to enforce the contract between CPP and CEI. After a hearing, the common pleas court, on June 2, 1995, denied the motion for a temporary restraining order ("TRO"). The trial court did not explain the basis for its decision. On August 23, 1995, the court granted CEI's motion to dismiss, for lack of jurisdiction. The city and AMP–Ohio timely appealed, raising three assignments of error as follows:

"I. The lower court erred in finding that it did not have jurisdiction to grant immediate injunctive relief to enforce a contract between utility companies and municipal electric utilities.

"II. The lower court erred in finding that it did not have jurisdiction to interpret and enforce a contract between utility companies and municipal electric utilities.

"III. The lower court erred in dismissing an action for lack of jurisdiction when the court had concurrent jurisdiction over the subject matter."

These three assignments will be discussed together because each raises the issue of whether the trial court has jurisdiction over this matter. The standard of review when a complaint is dismissed under Civ.R. 12(B)(1) is "whether any cause of action cognizable by the forum has been raised." *State ex rel. Bush v. Spurlock* (1989), 42 Ohio St.3d 77, 80, 537 N.E.2d 641, 644.

---

2. There are three agreements at issue: (1) the October 1985 agreement, (2) the interconnection agreement, and (3) the tariff. The interconnection agreement and the tariff are on file with the FERC. CEI argues that the tariff is central to this dispute because (1) CPP refers to the tariff in its complaint, and (2) requests for additional power are brought under the tariff as opposed to the October 1985 agreement. The only matters on review before this court are jurisdictional issues, not how these agreements affect each other.

8

■ CEI argues that the question in the breach of contract issue is now moot. CEI could continue, however, to refuse to transmit power each time it is requested, and the question of whether CEI breached its contractual obligation could return. Mootness, therefore, is avoided because this is an issue capable of repetition yet evading review. See *In re Protest Filed By Citizens for the Merit Selection of Judges, Inc.* (1990), 49 Ohio St.3d 102, 551 N.E.2d 150.

Indeed, given the litigation history of these parties, repetition is likely. The NRC has previously described the history of these parties as follows:

"We think that the applicants [including CEI] should not be taken at their word. The record is replete with evidence that, in the past, they have either refused or delayed the provision of wholesale power or of the interconnections necessary for it, to the great detriment of the small electric systems in their area.

" * * *

"A company bears a heavy burden in showing that past conduct will not be repeated. * * * We decline to find that the likelihood of similar conduct in the future is so remote that the present case is moot.

"Applying this test, we have concluded that the extensive past misconduct of the applicants suggests a real possibility that they may again try to force small electric systems in their area out of business once the heat of this litigation has passed. * * * We cannot rely on the good faith of those who have acted in bad faith." (Footnote omitted.) *Toledo Edison Co.* (1979), 10 NRC 265, at 398–400.

■ Generally, state courts have concurrent jurisdiction with FERC regarding the interpretation of contracts on file with FERC. *Florida Power Corp.* (1994), 68 FERC ¶ 61,351.[3] In *Portland Gen. Elec. Co.* (1995), 72 FERC ¶ 61,009, at 61,021, FERC further explained that its "jurisdiction to settle disputes over the meaning of rate schedules does not as a matter of law preclude state courts from entertaining contract litigation of the type raised by Edison's complaint in Oregon state court." (Footnote omitted.) FERC was especially persuaded of a need not to "close off from state review a wide range of conventional contract interpretation issues, whenever a contract is on file with the Commission, even if the matter at issue had little relation to the Commission's exclusive jurisdiction to determine the reasonableness of rates for wholesale sales of electric power in interstate commerce." *Id.* at 61,021. See, also, *Doswell Limited Partnership* (1992), 61 FERC ¶ 61,196; *Pennzoil Co. v. Fed. Energy Regulatory Comm.* (C.A.5 1981),

---

3. "The Commission has explained in a number of orders that issues of interpretation of a contract on file with the Commission are within the Commission's concurrent jurisdiction with the courts." *Puget Sound Power & Light Co.* (Feb. 21, 1996), 74 FERC ¶ 61,192, at fn. 1.

645 F.2d 360; *Delaware Cty. Elec. Coop., Inc. v. Power Auth. of New York* (1983), 96 A.D.2d 154, 468 N.Y.S.2d 233.

Twenty years ago, after considering an identical issue in *Cleveland Elec. Illum. Co. v. Cleveland* (1976), 50 Ohio App.2d 275, 4 O.O.3d 247, 363 N.E.2d 759, this court stated as follows:

"1. Questions of exclusive federal jurisdiction and the ouster of jurisdiction of state courts are determined by the claims made by the suitor in his complaint. The plaintiff bringing the suit is free to decide what law he will rely upon (*Pan American Petroleum v. Superior Court of Delaware* (1961), 366 U.S. 565 [656, 81 S.Ct. 1303, 6 L.Ed.2d 584], followed).

"2. Where a plaintiff asserts a traditional common-law claim in an action brought in a state court, this claim does not lose that character solely because there exists a scheme of federal regulations of the subject matter of the suit."

In *Cleveland Elec.* this court concluded that the common pleas court had jurisdiction to hear an action brought by CEI for money owed to CEI pursuant to the letter agreement between the parties. This agreement was on file with the Federal Power Commission, the predecessor to the FERC.

■ CPP contends, as did CEI in 1976, that this case is merely a contract dispute and that state courts have jurisdiction to interpret whether the refusal to provide the entire requested power on a firm basis during June 1995 violated section 3(a) of the 1985 agreement. CEI has not cited any case law holding that FERC has exclusive jurisdiction over this kind of dispute. The cases CEI cites all concern rates. CPP acknowledges that FERC has exclusive jurisdiction over rate-setting matters and primary jurisdiction over technical matters.

The dispute in the case at bar, however, is not about rates or technical matters. In its complaint, CPP never referred to any rates charged by CEI. On the contrary, CPP stated, "CPP and AMP–Ohio do not challenge, either expressly or impliedly, the rates terms and conditions determined by FERC." Thus the exclusive jurisdiction of FERC is not invoked.

■ CEI has suggested that the doctrine of primary jurisdiction controls this case. Primary jurisdiction " 'applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, *have been placed within the special competence of an administrative body;* in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views. *General American Tank Car Corp. v. El Dorado Terminal Co.,* 308 U.S. 422, 433, 84 L.Ed. 361, 370, 60 S.Ct. 325 [331].' (Emphasis added.)

■ "The doctrine of primary administrative jurisdiction does not apply, however, in relation to a question which, while properly determinable by an administrative agency *does not involve a matter within the special expertise of the agency* such as a matter of law. *Opdykev [Opdyke] v. Security Savings and Loan* (1950), [97 N.E.2d 435] 59 Ohio Law Abs. 212, aff'd, [99 N.E.2d 84] 59 Ohio Law Abs. 257 (1951), aff'd, 157 Ohio St. 121 [47 O.O. 97, 105 N.E.2d 9] (1952); *Eastern Shore Natural Gas Co. v. Stauffer Chemical Co.* (Del.S.Ct.1972), 298 A.2d 322." *Cleveland Elec.* 50 Ohio App.2d at 289, 4 O.O.3d at 255, 363 N.E.2d at 768.

More recently, the Tenth District quoted the United States Supreme Court's explanation of the doctrine of primary jurisdiction as follows:

" 'The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties. "Exhaustion" applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course. "Primary jurisdiction," on the other hand, applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views. \* \* \*

" 'No fixed formula exists for applying the doctrine of primary jurisdiction. In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation. These reasons and purposes have often been given expression by this Court. In the earlier cases emphasis was laid on the desirable uniformity which would obtain if initially a specialized agency passed on certain types of administrative questions. \* \* \* More recently the expert and specialized knowledge of the agencies involved has been particularly stressed. \* \* \*' " *Malone v. Academy of Court Reporting* (1990), 64 Ohio App.3d 588, 592, 582 N.E.2d 54, 57, quoting *United States v. W. Pacific RR. Co.* (1956), 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126.[4]

---

4. In *Malone,* the court reversed a Civ.R. 12(B)(6) dismissal because the State Board of Schools and College Registration did not have exclusive or primary jurisdiction over plaintiffs' complaint alleging breach of contract and fraud. The court noted, "There is no evidence herein of any overriding need for uniformity or that the agency has some special expertise concerning the subject matter of plaintiffs' complaint." *Id.,* 64 Ohio App.3d at 592, 582 N.E.2d at 57.

██ The doctrine of primary jurisdiction does not apply in the case at bar. First, there is no overriding need for uniformity regarding the resolution of this dispute. CPP has cast this action solely as a contract dispute between itself and CEI. Because contract disputes by their nature are disputes that are unique to the parties, uniformity is not an overriding concern. *Pennzoil Co., supra,* 645 F.2d at 385. That was the reason FERC found that its regulatory responsibilities did "not compel a uniform interpretation of the contractual language" at issue. *Puget Sound Power & Light Co.* (Feb. 21, 1996), 74 FERC ¶ 61,192, at 61,659. Moreover, Ohio courts have jurisdiction over contract disputes even if the case involves a public utility. *Marketing Research Serv., Inc. v. Pub. Util. Comm.* (1987), 34 Ohio St.3d 52, 56, 517 N.E.2d 540, 544.

██ Second, the resolution of this dispute does not require any special expertise by FERC. Admittedly, this dispute requires some level of understanding of the utility industry; however, the issue of whether CEI's refusal to commit to CPP's firm power request amounts to a violation of the agreement is an issue of contract interpretation which does not involve any specialized expertise. As FERC said in *Puget Sound, supra,* at 61,659, "The Commission has no special expertise in applying relevant contract law to divine the intent of the contracting parties as to the degree of firmness contemplated in their contract." [5]

The subsidiary question regarding the alleged discriminatory distribution of power also does not require a specialized tribunal. This court has previously acknowledged that an administrative body is limited in its ability to interpret contract disputes. In the earlier *CEI* case, this court stated, "The defenses raised by the City in the first action are not only matters of law and not within the special competence of the FPC [Federal Power Commission], they are matters of Ohio law, an area where the FPC would be at a severe disadvantage in interpretation." (Footnote omitted.) *Cleveland Elec.,* 50 Ohio App.2d at 289, 4 O.O.3d at 255, 363 N.E.2d at 768.

██ CEI also argues that the issue in the case at bar is controlled by the interconnection agreement or tariffs between the parties. CPP has alleged a violation, however, only of the October 1985 Agreement. In the complaint and throughout the lower court proceedings, CPP's argument was that the CEI decision not to transmit the requested power on a firm basis violated the agreement's prohibition against discriminatory reductions. CPP has exercised its right, as the plaintiff, to cast its complaint how it chooses, which in this case is as

5. · *Puget Sound* is highly instructive to the case at bar. In that case, petitioners requested an order from FERC whereby the commission would exercise primary jurisdiction over a dispute regarding what constitutes firm transmission service under the contract between the utility companies. FERC declined to exercise exclusive or primary jurisdiction over a controversy already pending in the courts.

a breach of contract. As appellants correctly note, "the party who brings a suit is master to decide what law he will rely upon * * *." *The Fair v. Kohler Die & Specialty Co.* (1913), 228 U.S. 22, 25, 33 S.Ct. 410, 411, 57 L.Ed. 716, 717. We agree with appellants, moreover, that "[i]t is CEI's *contractual* obligation to make the tariff service available, not the terms of the tariff, that is the issue." Accordingly, the lower court had concurrent jurisdiction to interpret and enforce the contract and erred in dismissing the action for lack of subject matter jurisdiction.

CPP's request for a TRO also stated a claim cognizable by this forum. To state a claim for injunctive relief, a litigant must show that (1) it is likely to succeed on the merits of the case, (2) the issuance of the injunction will prevent irreparable harm, (3) the potential injury that may be suffered by CEI will not outweigh the potential injury suffered by CPP if the injunction is not granted, and (4) the public interest will be served by the granting of the injunction. See, generally, Civ.R. 65; *Corbett v. Ohio Bldg. Auth.* (1993), 86 Ohio App.3d 44, 619 N.E.2d 1145; Donnellon, Injunctions and Restraining Orders in Ohio (1992), Sections 3.02–3.04. In the case at bar, CPP presented evidence to support these four elements.

## Likelihood of Success

When viewed in the light most favorable to plaintiffs, CPP presented sufficient evidence to support the first criterion regarding the merits of its claim that CEI breached its contract in this case. The trial court made no finding on this issue and apparently denied CPP's request for TRO on the erroneous ground that it lacked jurisdiction. For the same reasons we gave in the preceding discussion, the common pleas court has the jurisdictional authority to grant the injunction CPP requested. Having resolved this jurisdictional issue, we make no determination concerning the merits of the underlying contract claim, which should be resolved by the trial court in the first instance.

## Irreparable Harm

Regarding the criterion of irreparable harm, the record demonstrates that the discussion at the trial level focussed on the possibility of a blackout. "Irreparable harm," however, may be other than a crisis, such as the threat of a blackout. "An irreparable injury is one for the redress of which, after its occurrence, there could be no plain, adequate and complete remedy at law, and for which restitution in specie (money) would be impossible, difficult or incomplete." *Ohio Turnpike Comm. v. Texaco* (1973), 35 Ohio Misc. 99, 105, 64 O.O.2d 383, 387, 297 N.E.2d 557, 561.

■ Irreparable harm depends upon the context. The continuing door-to-door competition between CEI and CPP for customers and the extremely vulnerable position of CPP because of its almost total dependency upon CEI lines for transmission, in addition to the history recounted in *Toledo Edison, supra,* provide an important background to CEI's refusal to transmit firm power. Companies must plan ahead with the ability to do more than scrape through in emergencies. They must be able to guarantee power to new customers.[6]

■ What is at issue in the requested injunction is more than the specific megawattage requested. The threat of irreparable harm required for an injunction may be in CEI's claim that it has the discretion to place CPP in a priority lower than the very customers CPP is in competition for and in CEI's power to deny additional transmissions on short notice. Because of the short time lag between requests for power and actual transmission, the option of immediate injunctive relief is crucial.

## Weighing Injuries to Parties

Another consideration is whether CEI would be harmed by granting CPP's request. CPP stated and CEI never denied that "CEI has the capacity to transmit approximately 7,700 megawatts of power through its lines, but presently transmits approximately 2,200 megawatts of power." An additional sixty-two or thirty-seven MW pales in comparison to this capacity.

## Public Interest

The public interest in the court providing immediate resolution in matters affecting the reliability of power to residents of Cleveland is obvious. Also in the public interest is removing "impediments to competition in the wholesale bulk power marketplace." FERC has articulated this principle most emphatically in its recent order *Promoting Wholesale Competition Through Open–Access Nondiscriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities* (Apr. 24, 1996), 75 FERC ¶ 61,080, published in 61 F.R. 21540. In this lengthy order (two hundred ninety-five pages) reviewing the history of the electricity industry and its changes, FERC observed, "Substantial amounts of electricity now move between regions, as well as between utilities in the same region." *Id.* 61 F.R. at 21545. Transmitting utilities, which "own the transportation system over which bulk power competition occurs," continue to be a natural monopoly because they "can

---

6. CPP's reserve capacity to generate forty-eight MW on a temporary basis does not necessarily alleviate the threat to CPP as a competitor.

withhold supply and extract monopoly prices just as effectively as those who control facilities through ownership." *Id.*, 61 F.R. at 21550, 21546.

Observing both "blatant and subtle" denials of access and "the potential for future denials of access," the commission "determined that non-discriminatory open access transmission services (including access to transmission information)" is "critical to the full development of competitive wholesale generation markets and the lower consumer prices achievable through such competition." *Id.*, 61 F.R. at 21550. The commission found it "imperative," therefore, "to ensure that all wholesale buyers and sellers of electric energy can obtain non-discriminatory transmission access, that the transition to competition is orderly and fair, and that the integrity and reliability of our electricity infrastructure is maintained." *Id.*, 61 F.R. at 21541.

In the case at bar, if CPP cannot depend upon normal and reasonable increases in transmission, it cannot compete for customers and grow. Whether CEI's refusal to guarantee firm power in a nondiscriminatory manner is an impediment to that competition is a significant factor in determining the public interest and the threat of irreparable harm.

In determining whether to grant injunctive relief, courts have recognized that no one factor is dispositive. *Royal Appliance Mfg. Co. v. Hoover Co., Inc.* (N.D.Ohio 1994), 845 F.Supp. 469. The four factors must be balanced, moreover, with the "flexibility which traditionally has characterized the law of equity." *Friendship Materials, Inc. v. Michigan Brick, Inc.* (C.A.6, 1982), 679 F.2d 100, 105. When there is a strong likelihood of success on the merits, preliminary injunctive relief may be justified even though a plaintiff's case of irreparable injury may be weak. In other words, what plaintiff must show as to the degree of irreparable harm varies inversely with what plaintiff demonstrates as to its likelihood of success on the merits. *Id.*

Accordingly, the trial court had jurisdiction to consider the issues raised by the complaint and motion for TRO. The matter is remanded for proceedings consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

MATIA, J., concurs.

JAMES D. SWEENEY, P.J., concurs in part and dissents in part.

JAMES D. SWEENEY, Presiding Judge, concurring in part and dissenting in part.

While I concur with the majority's determination relative to the declaratory judgment issue, I must respectfully dissent in part, believing that the trial court did not abuse its discretion in denying injunctive relief to Cleveland Public Power.

The majority correctly states the four-part standard to be applied when injunctive relief is sought by a party. See, generally, *Corbett v. Ohio Bldg. Auth.,* (1993), 86 Ohio App.3d 44, 619 N.E.2d 1145, and Civ.R. 65. Also, it is unquestioned that the decision to grant or deny injunctive relief rests within the sound discretion of the trial court, which decision shall not be overturned on appeal absent a clear abuse of that discretion. *Garono v. State* (1988), 37 Ohio St.3d 171, 173, 524 N.E.2d 496, 498–499. Furthermore, it is beyond doubt that the evidence required of a party invoking the powers of equity must be clear and convincing and unexceptionable. *Call v. G.M. Sader Excavating & Paving, Inc.* (1980), 68 Ohio App.2d 41, 46–47, 22 O.O.3d 36, 39–41, 426 N.E.2d 798, 802–803. However, I disagree that the factor of irreparable harm was demonstrated by Cleveland Public Power.

It is axiomatic that "[t]o establish irreparable harm there must be an actual, viable, presently existing threat of serious harm. See *Massachusetts Coalition,* 649 F.2d at 74 ('Only a viable threat of serious harm which cannot be undone authorizes exercise of a court's equitable power to enjoin before the merits are fully determined.' ); see also *K–Mart Corp.,* 875 F.2d at 914.

"Plaintiffs must establish injury that is not remote or speculative, but is actual and imminent. See *United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953); [citations omitted]. In other words, the applicant must show that the injury complained of is of such imminence that there is a 'clear and present need for relief to prevent irreparable harm.' [citations omitted]. Thus, an injunction will not be issued to prevent the possibility of some remote future injury; a presently existing actual threat must be shown." *Sierra Club v. Larson* (D.Mass.1991), 769 F.Supp. 420, 422; see, generally, *Massachusetts Coalition of Citizens with Disabilities v. Civ. Defense Agency & Office of Emergency Preparedness* (C.A.1, 1981), 649 F.2d 71; and *K–Mart Corp. v. Oriental Plaza, Inc.* (C.A.1, 1989), 875 F.2d 907. See, also, *Camp Washington Community Bd., Inc. v. Rece* (1995), 104 Ohio App.3d 750, 754, 663 N.E.2d 373, 375–376 (equitable injunctive relief is precluded where the anticipated injury is doubtful or speculative; reasonable probability of irreparable injury must be shown); *Lemley v. Stevenson* (1995), 104 Ohio App.3d 126, 136, 661 N.E.2d 237, 244 (immediate injury must be demonstrated to obtain injunctive relief; the purpose of an injunction is to prevent a future injury and not to redress past wrongs); *Miller v. W. Carrollton* (1993), 91 Ohio App.3d 291, 296, 632 N.E.2d 582, 586 (equitable injunctive relief is precluded where the anticipated injury is

doubtful or speculative; reasonable probability of irreparable injury must be shown); *Fodor v. First Natl. Supermarkets, Inc.* (July 5, 1990), Cuyahoga App. No. 58587, unreported, at 5, 1990 WL 93210 (where damage is speculative, the harm thereby cannot be considered irreparable for purposes of injunctive relief).

In the case *sub judice*, the threatened harm advanced by Cleveland Public Power was the anticipation that the area might experience a heat wave in the upcoming summer months, thereby causing an anticipated shortfall in power capacity with the concurrent fear of CPP's customers being discriminated against in the apportionment of electrical power by CEI during the period of the heat wave. It was this anticipated harm that formed the rationale for the requested additional firm transmission service and the request for injunctive relief.

Using any reasonable interpretation, the threatened harm, *i.e.*, that a heat wave *may* happen at some future date, to the belief that electrical capacity would be threatened to such an extent as to cause brownouts, whether due to unfairly apportioned energy transmissions or not, to areas serviced by CPP, did not exist at the time of the request for an injunction. There was no evidence produced at the trial court level which would form a statistical basis demonstrating that a heat wave was anything more than a possibility, let alone a distinct probability. Likewise, there was nothing other than conjecture to show that CPP would be unfairly discriminated against in the apportionment of electrical power by CEI in the event of a heat wave. Even if we were to assume, for the sake of argument, that a heat wave was imminent, this would not constitute irreparable harm. Common knowledge dictates that heat waves and periodic brownouts are transitory by their very nature, thereby establishing that the harm (loss of electrical power for a time) is not irreparable. Once the crisis period has passed, the situation would stabilize and normal energy usage patterns would resume. Therefore, the threatened harm was speculative and undeserving of equitable relief at the time sought.