## Barton v. Commonwealth.

(Decided Dec. 21, 1934.)

NAPIER & EBLEN for appellant.

BAILEY P. WOOTTON, Attorney General, and DAVID C. WALLS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE RICHARDSON—Affirming.

Troy Adams was a deputy sheriff in Knott county, Ky., residing at Anco, one-half mile from Sassafras. Prior to the 5th day of March, 1934, he received for execution a subpœna for Chester Brown as a witness in a justice's court. On the morning of that day, he, with his father, Lindsey Collins and Tug Engle, left his home in his car to go to Sassafras; his purpose was to serve the subpœna on Brown, who resided at Sassafras.

Arriving at Sassafras, Collins and Troy's father went in Huck Smith's store. In a few minutes Troy came in and remained about ten or fifteen minutes. While there, at the invitation of Collins, he drank a mug of beer, then left, and went to the place of business of the accused, Lula Barton, where he found Chester Brown, Lula Barton, Ed Barton, Sam Hall, Sam Whittaker, and Harrison Brown. He served the subpœna on Chester, and at the time he did so Sam Hall was shining Brown's shoes. The accused and Ed Barton were behind the beer cabinet. At the time Troy entered the accused's place of business, Harrison Brown was drinking beer. He asked Troy to take a drink with him. He accepted the invitation. The accused used in her business 24 beer mugs; she obtained 2 of them and drew the beer into them. Harrison Brown received from her one of them and handed it to Troy. Troy sipped it about one inch down the mug; "it seemed like it strangled him some way or other"; he walked over to where Brown handed it to him, sat the mug on the beer cabinet, and began coughing as he did so and then walked out the door, coughing and trying to vomit. He returned into the accused's place of business and remarked, "I have just eaten breakfast, I can't drink just after I eat." Harrison Brown called to him; they sat down back of a table; Troy "kept strangling and seemed like he was coughing, he had a cigar in his hand and a penny box of matches and a handkerchief with which he was cleaning

his mouth." Brown began to engage him in a conversation relating to Troy "picking him up at Vicco the night before." In about three or four or five minutes Troy "hunkered himself down on the seat" and never again spoke. Those present, except the accused, endeavored to render him aid, and, while they were doing so, she remained behind the beer cabinet moving about. Within a few minutes Troy was carried to the home of Hall, where he immediately died. From the moment he sipped the beer he began to cough and strangle and immediately began to try to vomit and was "frothing at the mouth," and continued to engage in the latter until his death. While Harrison Brown was talking to him, his face was red; he was "blowing like he had something hot in his mouth and slobbering." From the moment he drank the beer until his death, the accused manifested neither interest in, nor sympathy toward, him. About the time Harrison Brown called those present to assist him with Troy, the accused picked up the mug of beer out of which Troy drank; Ed Barton mopped the beer cabinet with a rag and squeezed it out into the mug from which Troy had sipped the beer. The accused went back into the kitchen and returned, picked up the mug out of which Troy drank, emptied its contents, set it away, filled another mug with beer to about the point Troy had sipped out of the mug, and set it at the same place on the beer cabinet from which she had removed the one used by Troy. Three of those present observed her engage in this act.

After Troy was carried from her place of business to Hall's, the accused stated to Sam Hall, "You was watching me get the beer." In a few minutes after Troy's death, Herbert Boelyn went to the place of business of the accused and got the mug of beer which was setting at the place Troy placed the one used by him, and carried it to a physician for the purpose of having its contents examined and analyzed for poison. The accused had him trailed, for the purpose, as she stated, to see that nothing was put in it before it reached the hands of the physician.

Troy was carried to the office of the undertaker, who, with the physician present at the death of Troy, pumped from his stomach about one pint of its contents; bottled it, when it was delivered to the undertaker. The undertaker himself obtained a pint of blood from the body of the deceased, which together with the

bottle containing the contents of his stomach and the beer obtained by Boelyn were inclosed in a box, wrapped, sealed, and expressed to Dr. E. S. Maxwell, Lexington, Ky., who received it from the hands of the express agent and delivered the same to Dr. J. H. Martin. On arrival of the box at Lexington, it was intact and sealed, and had not been tampered with after it left the hands of the undertaker. Dr. Martin broke the seal, opened the box in the presence of Dr. Maxwell, and took possession of the three bottles, one containing blood, the other the contents of the stomach, and the bottle containing the beer. He analysed a portion of the contents of each bottle. The analysis showed the contents of the stomach contained 1.90 grains of potassium cyanide; the blood a smaller quantity of the same poison. The beer was free of poison. The undertaker, at the time he obtained the blood from the body of Troy, stated "it was cherry red." This is the color of it described by Dr. Martin. The physicians agree that potassium cyanide is a deadly poison producing death at any time from within two to twenty-five minutes, according to the dose, and also depending upon whether it is inhaled or swallowed, or both. Dr. Martin states that its symptomatic effects on a human being were the same as those manifested by Troy and described by the persons present immediately following his drinking the beer until his death.

The accused, from some time in December next before the death of Troy Adams, was engaged ostensibly in the business of conducting a restaurant and operating a beer joint at the place at which Troy drank the beer. About a week before his death, in company with other deputy sheriffs, he had conducted a raid on her place of business in the execution of a search warrant authorizing him to do so. Whisky was found in her place of business, for which she was arrested, tried, and convicted. From the judgment of conviction, she had taken an appeal to the Knott circuit court which was pending at the time of his death. Troy was a witness for the commonwealth in the prosecution, and testified against the accused. Soon after the analysis of the contents of the stomach and blood was completed, the accused was arrested on the charge of murder, alleged to have been committed by the administration of poison by and through the mug of beer of which Troy drank at her place of business. Granville Stacey, United States commissioner, residing at London, Ky., who was born and

raised at Sassafras, Knott county, assisted the accused to engage in business at Sassafras by furnishing her the means; the same business in which she was engaged at the time of the death of Troy Adams. After she was placed in jail, he went to see her concerning their financial matters. He discussed with her the poisoning and death of Troy Adams. This was after the analysis of the contents of the stomach had been completed. She asserted her innocence, but expressed the opinion that the cyanide "could be obtained by any one most anywhere." He inquired of her whether she had seen, or could obtain, cyanide; "she evaded the answer." She discussed with him the presence of a trunk left at her home at the time she was arrested and transported to jail. She inquired of him "if anyone had gone into it or if anyone could get into it." He claims she mentioned about the trunk frequently. On Monday following the conversation with her he went to her apartment at Sassafras and saw the trunk. At the time she was arrested on this charge the trunk was seen by one or more of the arresting officers in the house occupied by her. Later a search warrant was issued, directed to the sheriff of the county, authorizing him to search her apartment for it. The officers in obedience to the warrant did so, but failed to find the trunk. After she was arrested, she was accompanied to the county seat by three deputy sheriffs and the driver of the automobile in which they were riding. In discussing Troy Adams, she remarked in the presence of the officers and the driver of the automobile, "she didn't like him before he died and didn't like him yet." The persons in the automobile with her at the time testified they heard her make this statement.

On a trial before a jury, she was found guilty and her punishment fixed by the verdict at confinement in the state reformatory during her natural life. She is here arguing the verdict is "palpably and flagrantly contrary to the evidence," "the result of passion and prejudice." Our resume of the evidence is sufficient response to this insistence. The evidence was abundantly sufficient not only to authorize the submission of the case to, but to sustain the verdict of, the jury. She was not entitled to a directed verdict.

It is a familiar rule that, where there is any competent evidence, however slight, the case should be submitted to the jury; also the credibility and the weight

to be given to the testimony of the witnesses are exclusively within the province of the jury. Simmons v. Commonwealth, 207 Ky. 570, 269 S. W. 732; Blanton v. Commonwealth, 245 Ky. 546, 53 S. W. (2d) 952. She further argues her rights were prejudiced because of the admission of incompetent evidence.

In support of this argument in her brief it is said:

"We wish to call the court's attention to the evidence of the witness, James H. Martin [see transcript of evidence, volume 1, pages 4 to 24], which evidence was offered as expert testimony and which evidence when offered in a court of justice should be carefully considered, especially when the life and liberty of a person is involved. We except to all the questions and answers thereto that we deemed necessary. As to the evidence of Sam Hall, we invite a careful investigation. This evidence may be found in volume 1 of transcript of evidence, pages 40 to 54, inclusive."

It should be noted that the attention of the court is directed to the whole of the testimony of these two witnesses for search to ascertain what incompetent statements of these witnesses is alluded to. No particular question or answer is pointed out in her brief.

From a sense of duty and an obligation to do justice in every case, we not only carefully, but diligently and conscientiously, consider every case after the fashion invited in her brief.

An examination of the record discloses that she objected to the testimony of Dr. Martin detailing his receiving, opening, and analyzing the contents of the stomach and the blood of the deceased. No reason is assigned showing the incompetency of his testimony in this respect, and we can conceive of none.

Sam Hall was asked to describe the actions of the accused when drawing and delivering the beer to Troy Adams, as well as her statements and conduct on the occasion under investigation. Such evidence was clearly competent, and no valid reason for holding otherwise is presented.

In the closing argument of the employed counsel assisting the commonwealth, this statement was made:

"Gentlemen of the jury, a conviction of life in this case would not be worth anything. You convict

this woman for life and those in authority will pardon her in a short time.''

The insistence that this statement was prejudicial to her rights is not meritorious. The fact the jury fixed the accused's punishment at confinement in the reformatory for her natural life demonstrates it disregarded this statement of counsel. Though made to the jury, it was disregarded by it, and therefore we cannot assume that which its verdict shows is incorrect.

Perceiving no prejudicial error to the substantial rights of the accused, the judgment is affirmed.