OHIO TURNPIKE COMMISSION *v.* TEXACO, INC.

(No. 917,853—Decided June 13, 1973.)

Common Pleas Court of Cuyahoga County.

*Mr. Lockwood Thompson,* for plaintiff.
*Mr. Smith Warder, Messrs. Arter & Hadden,* and *Mr. William R. Slye,* for the defendant.

FINK, J.   This case came on for hearing this 13th day day of June, 1973, upon the Complaint of the plaintiff, Ohio Turnpike Commission, for a preliminary injunction to prevent defendant, Texaco, Inc., from restricting the purchase of gasoline and diesel fuel by customers using the facilities owned by the Ohio Turnpike Commission and operated by Texaco, on the evidence presented by both parties, the briefs of counsel, and the law.

The court finds that there are sixteen service station plazas located upon the Ohio Turnpike.   Each is operated as a result of a written contract entered into by competitive bidding between the Ohio Turnpike and the respective companies operating said stations.   At the present time four such stations are operated by Texaco and the other twelve are operated, four each, by three other prominent oil companies.   Only the defendant, Texaco, has indicatd to the plaintiff, Ohio Turnpike Commission, that it intends

to limit the sale of gasoline and diesel fuel to its customers on the turnpike.

The issues presented are as follows:

1. Does the contract between the plaintiff and the defendant require that defendant service all of the needs of the customers utilizing the facilities of the turnpike operated by the defendants herein?

2. If so, would a limiting of the sales of gasoline to 10 gallons per automobile and of diesel fuel to 35 gallons per customer with reductions down to 25 gallons per customer, constitute irreparable injury to the plaintiff, which can only be properly remedied by the utilization of a preliminary injunction?, and

3. If so, has evidence been presented which would make the action contemplated by Texaco legally valid or legally excusable and thus prevent the issuance of an injunction in the case at bar?

This court shall treat each of these issues in order.

I. The contracts for the operation of the four Texaco service plazas became effective on October 1, 1965, for a ten-year period terminating on September 30, 1975, and thus have some two years and four months remaining. The operative provisions of the contracts are as follows:

"§5. RENT. The Operator shall pay to the Commission on all sales made and services rendered by Operator from the premises during the term of the contract the following rental: 9.77 cents per gallon on the sale of all gasoline, three cents per gallon on diesel fuel sold to commercial operators, and ten percent of the gross receipts from the sale, including all sales to the Operator, of all other merchandise (including motor oil) and from the performance of services.

"In the event that diesel fuel or motor fuel other than gasoline attains wide and general use for passenger cars it shall be dispensed to passenger cars from the pumps in front of the building and payment to the Commission shall be at the rate bid per gallon for gasoline for all diesel fuel or other motor fuel so dispensed.

"The term 'gross receipts' shall mean the amounts re-

ceived, in cash or credit, from the sale of all products and services, including vending machine products, from the premises, except gasoline and diesel fuel, or other motor fuel, whether sold for consumption on or off the premises, and shall include the amounts received from the sale of all goods whether sold at the station or delivered elsewhere. In case of trade in allowance or warranty adjustments, Operator shall be considered to have received the retail list price and no deduction shall be made therefrom. 'Gross receipts' shall include the amounts charged in any and all credit transactions, whether any such amount or any part thereof be collected or not. 'Gross receipts' shall not include any amount collected by Operator from a consumer as state sales tax or federal consumers' excise tax, but 'gross receipts' shall include any amount paid as federal manufacturers' excise tax. The general intent of this provision is to include within 'gross receipts' all amounts received or charged by Operator as consideration for merchandise and services irrespective of any tax payable by him but to exclude therefrom all amounts which he is required by any law to collect from his customers, and, in turn, to pay over to any governmental agency, either by prepurchase of tax stamps or otherwise. 'Gross receipts' shall not include income from any public telephone located on the premises.

"The relationship of debtor-creditor shall exist between the parties as to the Commission's share of moneys collected but not paid to Commission."

"§7. STANDARD OF SERVICE. The Operator shall at all times offer for sale diesel fuel and at least two grades of gasoline, one 'regular' grade and one 'premium' grade as such grades are commonly known in the industry. The Operator may at his option offer more than two grades of gasoline; provided, however, that if during the term of this contract, including extensions thereof, a new motor vehicle fuel attains wide and general use, the Operator may with the consent of the Commission or at the request of the Commission shall offer such new fuel at the service stations.

"Operator agrees to operate the service station in a highly efficient manner, and to conduct his operations in accordance with the highest standards of management for service stations, to the end that the public may be served promptly in the best possible manner and that public esteem may be won for Operator, his service and products, and for the Ohio Turnpike. Operator shall at all times have sufficient attendants on duty and sufficient pump islands in operation so as to insure that no more than five vehicles are being served or waiting to be served at any one time at one pump lane. A continuing violation of the requirements set forth in this paragraph shall be deemed nonperformance in accordance with the provisions of §34."

"§19. HOURS. Operator shall operate the service station twenty-four hours of every day during the entire term of this contract, unless the Commission otherwise permits in writing."

"§34. CANCELLATION FOR NONPERFORMANCE. If Operator fails to conduct his operations in accordance with the terms, conditions, and provisions of this contract, the Commission may notify Operator in writing of such failure, specifying in what manner Operator is failing in his duties. Operator shall have thirty days to correct the conditions set forth in the notice from the Commission, and if, at the end of such thirty-day period. Operator has not corrected said conditions, or taken all reasonable steps to correct said conditions, the Commission may terminate this contract. Such termination shall not be effective until sixty days after the service of written notice thereof. The rights in this §34 conferred upon the Commission are exercisable at its option, and are alternative and additional to all other remedies herein or by law granted to Commission for breach hereof by Operator."

"§36. CANCELLATION FOR CEASING OPERATIONS. If Operator ceases for any period of time without reasonable cause to furnish motor fuel, motor oil, or a majority of the other goods or services contained on Operator's list of goods and services required by §7, the Commission may, at its option, terminate the contract imme-

diately. The right of termination under this section shall be in addition to the termination provisions of §§34 and 35.''

Texaco argues that there is no explicit statement within the contract that says that Texaco must sell to every customer on the turnpike *all* of the gasoline and diesel fuel which such customer desires in order to fill up the tank of his automobile or truck which is utilized for the movement of such car or truck, and that the failure to make such term explicit means that there is no requirement of Texaco to make such sales and therefore there is no breach of said contract which can result in an injunction. (Emphasis mine.)

The Ohio Turnpike Commission, on the other hand, argues that although not explicit, such term is implicit within the contract and that any other interpretation of the contract would be an absurdity.

The court has set forth above the applicable provisions of the contract in question. In 1965 when these contracts were entered into there was no rationing in existence, nor was any reasonably contemplated. Furthermore, for the Ohio Turnpike Commission to have accepted bids which would allow Texaco or other oil companies to sell only what they wished to sell or what they said they had available to sell would have been inconsistent with the public good, and inconsistent with the desire of both parties to make a maximum income for each from the operation of the contract. Furthermore, the contract itself makes it mandatory that the operator sell diesel fuel and two kinds of gasoline twenty-four hours a day to the motoring public. It therefore appears obvious and clear to the court that it was the intention of both parties to provide for all of the fuel needs of the public utilizing these facilities on the Ohio Turnpike. It must be remembered that the Ohio Turnpike is a vital link in the interstate highway system running from Chicago to New York. It connects with the Indiana, Pennsylvania and Michigan interstate systems. Its operation is essential to both intra and interstate commerce. It is operated by a quasi-governmental body for the public good and in the public interest; that is, for the benefit of all

of the people of this state and of the other states as well as foreign visitors who may wish to utilize its facilities.

It is therefore the finding of this court that implicit in the contract is a requirement that Texaco provide for all of the fuel needs of the motoring public legally using the facilities of the Ohio Turnpike. Any other interpretation does not make sense.

In a leading case on this subject in the Court of Appeals of New York in the famous case of *Wood* v. *Lucy, Lady Duff Gordon* (1922), 222 N. Y. 88, 91, 118 N. E. 214, the immortal Judge Cardozo stated:

"* * * We think, however, that such a promise is fairly to be implied. The law has outgrown its primitive state of formalism, where the precise word was the sovereign talisman, and every slip was fatal. It takes a broader view today. A promise may be lacking, and yet the whole writing may be 'instinct with obligation,' imperfectly expressed * * *."

Certainly in the case at bar, the language contained in the contracts is "instinct with obligation." Ohio law is in accord with these principles. See *Bascom* v. *Shillito* (1882), 37 Ohio St. 431. See, also, *Doyle* v. *Doyle* (1893), 50 Ohio St. 330; *Cleveland* v. *B. & O. Railroad Co.* (C. A. 6, 1934), 71 F. 2d 89; and, generally, 11 Ohio Jurisprudence 2d 388.

See, also, *Warfield Natural Gas Co.* v. *Allen* (1933), 284 Ky. 646, 59 S. W. 2d 534; *Bromley* v. *McCormick* (1929), 77 S. W. 2d 397.

It therefore follows, and this court finds by clear and convincing evidence, that if Texaco refuses to supply all of the needs of the consuming public at the facilities in question, there is a breach of such contract.

II. The next issue to be determined is whether or not such attempted rationing or restricting of sales constitutes an irreparable injury within the definition of that term in the law. That an injury can be anticipated in the event fuel is restricted is clear from a reading of the contract. The public health, welfare and safety are of paramount concern. There is clear reference to the protection of the public interest involved in maintaining the service station

facilities, and there is a clear obligation of both the Turnpike Commission and the operator, Texaco, as reflected in the "Standard of Service" provision of the contract to protect this public interest. To perform the contract in derogation of those legal obligations certainly constitutes an injury.

An irreparable injury is one for the redress of which, after its occurrence, there could be no plain, adequate and complete remedy at law, and for which restitution in specie (money) would be impossible, difficult or incomplete.

"* * * by irreparable injury is meant an injury of such a nature that fair and reasonable redress may not be had in a court of law and that to refuse the injunction would be a denial of justice * * *." *Thompson* v. *Smith* (1930), 155 Va. 367, 154 S. E. 579, 71 A. L. R. 604.

" "* * * Whenever a right exists or is created, by contract * * * *a violation of that right will be prohibited*, unless there are other considerations of policy or expediency which forbid a resort to this prohibitive remedy [of injunction]. * * * This jurisdiction of equity to prevent the commission of wrong is, however, modified and restricted by considerations of expediency and convenience which confine its application to those cases in which the legal remedy is not full and adequate * * *.' " *Clemons* v. *Bd. of Education of Hillsboro* (C. A. 6, 1956), 228 F. 2d 853, 856, 73 Ohio Law Abs. 23, in which the court granted injunction.

The court must consider the effect of rationing on a captive motoring public and on the commerce of this state and nation. There can be no doubt but that inconvenience and hardship as well as an increase in safety hazards would result. Furthermore, since the evidence shows that the average car or truck could not traverse the entire length of the turnpike even on a full tank of gasoline, obviously rationing by Texaco would increase the demand on the other stations as well as impede both intra and interstate commerce. By all of the legal definitions of irreparable injury, given the history of this case, the court finds by clear and convincing evidence that irreparable injury would result by the actions contemplated by Texaco.

III. Texaco argues that even though there might be a

violation of the contract in question and even though there may be irreparable injury, that nevertheless Texaco's action in attempting to unilaterally restrict the purchase of gasoline and diesel fuel, or to allocate gasoline and diesel fuel to its stations on the Ohio Turnpike, or to ration gasoline as it deems appropriate, is legally excusable in that any such restriction is a result of a request by the Government of the United States suggesting a voluntary-type of rationing and thus is exempted by the terms of Section 27 of the contract. Section 27 reads as follows:

"§27. LAWS AND REGULATIONS. Operator agrees to comply with all local, state, and federal laws and regulations applicable to his operation."

Texaco relies upon a statement made by a Mr. William E. Simon, Deputy Secretary of the Treasury, which statement was made before the United States Senate Committee on Banking, Housing and Urban Affairs, on Thursday, May 10, 1973.

It should be noted that this statement was made before a committee of Congress which is considering possible legislation with respect to a possible shortage of gasoline and petroleum products. It is further to be noted that no action thus far has been taken by this committee or by the Congress of the United States and that there is no law now in effect enacted by Congress which authorizes by law either voluntary, compulsory or mandatory rationing. It is also to be noted that there has been no Executive Order issued by the President of the United States authorizing either voluntary or mandatory gasoline or oil rationing.

The only other possibility for legal justification for such action might have been found in the Economic Stabilization Act of 1970 and the Economic Stabilization Act Amendments of 1973 (P. L. 93-28, April 30, 1973). However, those acts require that before their provisions can be operative, action must be taken by the Government ordering these provisions into execution. To date, no such action has taken place.

It is therefore obvious that there is no law, no legislative act and no Executive Order now in effect upon

which Texaco may rely to excuse it for its failure to live up to the terms of its contract with the Ohio Turnpike Commission.

A good analysis of when rationing or allocating of supplies might be applicable is found in 46 American Jurisprudence 421:

"The question of pro rata performance by a seller who has contracted to deliver a stated quantity of goods to several buyers, by delivering a proportionate amount to each buyer, generally arises where full performance is sought to be excused under express provisions in the contract for the relief of the seller from his obligation fully to perform in the case of certain conditions or events. In the absence of any provisions in the contract of sale excusing nonperformance by the seller, his obligation to perform is ordinarily an absolute one non-performance of which is not excused unless performance is made unlawful or is prevented by the other party, or unless the subject matter of a sale of specific goods is destroyed. In the presence of such an absolute obligation, the doctrine of pro rata performance among co-existing obligations cannot and does not operate. The application of the doctrine of ratable performance is limited to promises to deliver which are express or impliedly conditional upon the possibility of delivery. * * *"

However, the court finds that none of these situations has been proven to exist in this case.

The court next sought to find from the testimony of the witness offered by Texaco some other legal basis for the anticipated restriction of its sale of gasoline and diesel fuel to its customers on the Ohio Turnpike and the court itself questioned Texaco's representative at great length to determine the basis upon which Texaco sought to restrict its sales on the Ohio Turnpike.

The court is mindful of the possibility of legal excuse and, in this regard, to the general statement regarding this doctrine as found in 46 American Jurisprudence 420:

"In order that a party be excused from performing his contract obligation by an absolving clause contained

in the contract to sell or supply goods, the excuse must not only be one coming within the terms of such clause, but it must have been one reasonably beyond the power of the party to prevent; that is, such a clause will not give a party the power arbitrarily to refuse performance, but he is under a duty to exercise a reasonable amount of care to prevent the happening of the contingency named. The excuse pleaded must also be the proximate cause of the failure to perform. Moreover, the seller must prove that the contingency provided for by the contract provision did happen.''

There is no such provision in the contract at issue in this case.

''The general rule is that if one contracts unqualifiedly to do something which, at the time the contract is made, is possible to be done, he must make his promise good even though its performance is subsequently rendered actually impossible.'' 11 Ohio Jurisprudence 2d 513.

''One who makes a contract never can be absolutely certain that he will be able to perform it when the time comes, and the very essence of it is that he takes the risks within the limits of his undertaking. * * * when the scope of the undertaking is fixed, that is merely another way of saying that the contractor takes the risks of the obstacles to that extent. * * *'' Justice Holmes in *Day* v. *United States* (1917), 245 U. S. 159, 161, 62 L. Ed. 219, 38 S. Ct. 57.

''An express contract to do an act which is possible in the nature of things and not contrary to law will not be discharged by subsequent events or rules of law which do not render performance physically impossible, but merely make performance more burdensome, expensive or difficult, nor where such subsequent events or rules of law might reasonably have been contemplated.

''In order to make available the defense of legal impossibility of performance by reason of government interference in the control of production * * * it must be proven that there was * * * actual * * * intervention or government mandate as prevented further performance.'' *Indemnity Co.* v. *Commissioners* (1923), 107 Ohio St. 51, 140 N. E. 672.

"The burden of proving the defense of impossibility of performance is on the party asserting it." *Hensler* v. *Los Angeles* (1954), 124 Cal. App. 2d 71, 268 P. 2d 12; *Paramount Pictures* v. *Sparling* (1949), 93 Cal. App. 2d 768, 209 P. 2d 968; *McNally* v. *Moser* (1956), 210 Md. 127, 122 A. 2d 555.

The only witness offered by Texaco was Mr. Robert B. Smithwick, general manager of Texaco sales for the United States. Mr. Smithwick testified in essence that he was advised by S and D (the supply and distribution department of Texaco) that he was to have for sale throughout the United States in the year 1973, a total of 200 million barrels of fuel, and that this amount would not meet the industry demand forecast for 1973. He stated that on the basis of this demand forecast, there would be approximately 6% less fuel available than was required, and that as a result, Texaco's officers had decided to allocate 6% less gasoline and diesel fuel to its customers. There was no evidence at all offered as to why supply and distribution had told Mr. Smithwick he could have only 200 million barrels of fuel for distribution in the United States in 1973, nor was there any evidence offered that the growth forecast was accurate. The court pressed the witness for facts, but there were few forthcoming. The court questioned Mr. Smithwick, as follows:

"The Court: I have a few rather pertinent questions. You testified that the supply and distribution part of Texaco, Inc., informed you as a sales manager for the United States of America that they were going to give you, roughly two hundred and two million drums of fuel, or something, this year. Is that right, that they told you those were your allocations?

"The Witness: I testified that the supply and distribution of our company indicated to us that they were going to make available, probably two hundred million barrels of gas to this department in 1973.

"The Court: Now, they could just as well have told you they could make available one hundred fifty million barrels of gasoline, couldn't they?

"The Witness: I am sure they could have said that.

"The Court: They determine—do they not, supply and distribution where all of the fuel oil, gasoline, diesel fuel and otherwise, that your company produced, for business or otherwise, as for distribution, where it will go all over the world, don't they, what you are going to sell Japan, Germany, Great Britain; what you are going to sell any purchaser you may have, they allocate it, don't they?

"The Witness: They are responsible for making available supplies and distribution, but based over some estimate of requirements and, then, they can come as close as they can.

"The Court: But they have the policy decision of determining whether they will give two hundred million barrels and 25 million barrels to Great Britain or Japan or anybody else, they make the allocation as to who gets what, based upon this total supply, don't they?

"The Witness: I am not aware that they do.

"The Court: Well, somebody in your company decides who gets what percentage of your products and who doesn't, don't they?

"The Witness: Yes, I would assume so.

"The Court: Well, who does that?

"The Witness: I don't know.

"The Court: You don't know?

"The Witness: I don't.

"The Court: All you know is S and D says you can have two hundred million barrels for this year, and you work with what they give you for domestic, U. S. A., 50 states, you are saying. Is that correct?

"The Witness: Yes.

"The Court: Now, it is true, is it not, that the amount of profit made by Texaco on items that it sells the Ohio Turnpike Commission per contract will be different, for example, from the amount of profit that will be made by Texaco for what it sells its stations that are either privately owned or operated, correct?

"The Witness: I would assume that there would be a difference, yes.

"The Court: There is as much a difference, is there

not, in the bulk profits which are made per tank car or per truck tank car of items which you sell to your wholesalers or distributors as items themselves, isn't there?

"The Witness: There is a difference between what price we will sell a distributor at, and that price at which we sell a retailer who is operating one of our service stations.

"The Court: For example, how much do you charge your lessee, on the Ohio Turnpike Commission, per gallon of gasoline? What do they pay you per truckload per gallon of gas that they buy?

"The Witness: I don't know.

"The Court: Well, out of that they have to pay 9.77 cents to the Ohio Turnpike Commission, don't they?

"The Witness: We are salary operated on the Ohio Turnpike Commission stations.

"The Court: I understand, but you are supplying them with fuel, aren't you?

"The Witness: We are supplying the State with fuel, right.

"The Court: So, what I am trying to get at is, you have to sell gasoline to that salary operated station. There must be a cost price per gallon to you after you deduct the 9.77 cents you pay to the Ohio Turnpike Commission. Correct? You are making some money per gallon for every gallon of gasoline that is sold on the Ohio Turnpike, isn't that true?

"The Witness: I have no idea as to what the commissions are of the Ohio Turnpike Commission arrangement except that the price we pay to the commission, which I think has already been testified as being 9.77 cents per gallon.

"The Court: Now, what I am trying to get at, is the profit made by Texaco, Inc., in the sale to the Ohio Turnpike Commission the same as the profit per gallon made when it sells to its own lessee or private owner of Texaco stations? If you know?

"The Witness: I don't know.

"The Court: Well, as a matter of fact, it is different, isn't it?

"The Witness: I would think it would be different, yes.

"The Court: And is it the same price and the same profit that is made on what you sell to your wholesaler or distributors, as you call them?

"The Witness: There would be a difference in the commission. I don't have it available. I don't really know.

"The Court: And is it a different price than the profit, per gallon profit, to what you sell your consuming accounts which you said were largely community states, local, political communities, et cetera?

"The Witness: Is your question, is the price of the Ohio Turnpike Commission different?

"The Court: No. Isn't it a fact that the profit picture per gallon of fuel sold is different from what is sold on the Turnpike, independent dealer, rather, where lessees or owners differently involved and distributors, wholesalers, all different to what you sell consuming accounts as large companies, state, et cetera?

"The Witness: I don't have the answer to this question, your Honor.

"The Court: Is the commission to Texaco, as far as its profit and, lease concerned a factor which it considers in the sale of its products to people that are buying them?

"The Witness: Yes.

"The Court: Do you have anything further, Mr. Warder or Mr. Slye?

"Mr. Slye: A few questions on redirect, your Honor, if I might.

"REDIRECT EXAMINATION

"By Mr. Slye:

"Q. Mr. Smithwick, the judge has pointed out that we have different profits presumably on various types of accounts and sales, taking in the most profitable accounts, whatever they are, what allocation program applies to these accounts?

"A. The same allocation program that applies to all accounts.

"Q. Is profitability of any account taken into consideration in any way in allocation of the allocation program?

"A. No Sir.

"The Court: You can't know that because you have said you don't know on what basis they sell in the United States and Japan, and all the countries, because you don't know who makes the determination of what percentage will be sold here or elsewhere, can you?

"The Witness: I also testified that there was a difference in the commission generally. Specifically, what it was, I did not know. As I understand, there is a difference and, as I understand, they are allocating to all on the same basis.

"The Court: That is all within this country within your two hundred million barrels, roughly?

"The Witness: Correct.

"The Court: You don't know how that allocation was made with respect to products you are making available to dealers and consumers of yours outside of the United States, do you?

"The Witness: I am not familiar with that.

"The Court: All right."

The Court continued to question Mr. Smithwick:

"The Court: What I am saying, normally, when Texaco or any other company enters a contract with the turnpike commissions or thruways, they take a bid and accept it. It is their general intention to supply all of the products on whatever basis they bid it. Isn't that true?

"The Witness: Our intent is to supply all of the products within the available supplies and within the terms of the program. If we are the successful bidder, we are awarded the bid.

"The Court: Did you ever have a case since you have been with Texaco, a person who has entity, that we are not going to give you the products that you ordered before this? Did you ever try to ration any other turnpike prior to the May 30th notification which you gave to this Commission in Ohio and which, you say, about the same time you started at the operated stations, contract operated stations on the throughway in New York?

"The Witness: We have never done rationing on throughways, to my knowledge, prior to this.

"The Court: So, that it would be fair to say, would

it not, that up until this time, it was also the standard that you would supply the demands of your particular customers. Were you giving minimums and maximums in certain contracts, what the most they could get was, and what the minimum was?

"The Witness: Respectfully, I cannot give imaginables. Availability of products was based on available supplies, and it has always been that way, to the best of my knowledge.

"The Court: That is allocated by S and D. You are not telling me Texaco only has ten hundred million barrels of gasoline available for sale, are you?

"The Witness: I am telling you, as of right now, for the year 1973, the best estimate we have as available in the United States is two hundred million barrels.

"The Court: That is because S and D said that is what they are going to give you in the United States. They are selling in other places. You have said that already.

"The Witness: I have said S and D has said to us available, in supply and distribution in the United States, we have for you in 1973 approximately two hundred million barrels of gas.

"The Court: I know, but you have also said, as I understand, they made other fuel available to people outside of the United States.

"Mr. Warder: Objection: I don't think he said that.

"The Witness: I don't recall saying that.

"The Court: Isn't that a fact? Doesn't Texaco have customers outside of the United States?

"The Witness: Customers outside of the United States, I don't think so. I said I am not aware of how exactly the allocation of these products—

"The Court: But, they do sell fuel outside of the United States so, that there is available fuel in some amount, not known to you, for other customers outside of U. S. A. Correct?

"The Witness: I would certainly assume so.

"The Court: That is what I thought you said."

The questioning continued:

"FURTHER REDIRECT EXAMINATION

"By Mr. Slye:

"Q. Mr. Smithwick, has Texaco exported gasoline from the United States to any other part of the world?

"A. Not to my knowledge.

"The Court: Does it import gasoline into the United States from any other part of the world?

"The Witness: Not that I am aware of. No.

"The Court: Fine. What are you saying is if they don't import any into the country, then, all the gas produced by Texaco, and they don't export any out of the country, then the total amount produced in the United States is two hundred million gallons this year. Is that what you are saying?

"The Witness: No. I am not saying that at all. I am saying I am not aware of any being exported out of the United States or any gasoline imported into the United United States.

"The Court: Or anything you make gasoline out of?

"The Witness: I am not aware. I am sure that you know that we are refining gasoline in the United States and that is part of the supply made up in our system.

"The Court: I am aware. That is why I don't understand your attempting to create confusion with the problem.

"The Witness: I don't mean to be doing that.

"Q. On crude oil, does Texaco export crude oil from the United States that you know of?

"A. I am not aware.

"Q. Does Texaco import crude oil?

"A. I don't know.

"Mr. Slye: I have nothing further."

The testimony offered no proof whatsoever of a fuel shortage. Actually it is accented more by lack of knowledge and lack of facts than anything else, and it appears to be somewhat inconsistent with the tenor of Texaco's annual report which seems to express an anticipated increase of fuel for sale in 1973.

This report is dated March 7, 1973, and states in pertinent part:

"Worldwide, Texaco's gross production of crude oil

and natural gas liquids average 4,021,000 barrels a day, up *14.7%* over 1971. Refinery runs were 2,952,000 barrels a day, an increase of 2.7% over the previous year. Petroleum products sales average 3,381,000 barrels a day, a gain of 8.0% over the previous year. Natural gas sales were 4,685,000,000 cubic feet a day, an increase of 12.4%. These operational figures include interests in affiliated companies.

"The demand for products throughout the industry is continuing to grow at a fast rate, as witnessesd by the fact that the free world consumed an average of about 45 million barrels a day in 1972, an increase of almost 7% compared with the 4.7% growth in 1971. The anticipated increase in 1973 will be about the same as 1972, *close to 7%.*" (Emphasis mine.)

It would appear that if Texaco increased its production by 14.7% in 1972, as it says in its 1972 annual report, and if further as it says the increase in demand in 1972 was only 7% and is expected to be close to 7% in 1973, that this 14.7% increase in 1972 would clearly cover the increased demand that is expected.

What Texaco seems to seek to do is to rely upon an opinion expressed by a sub-cabinet officer before a committe of Congress as a legal justification for limiting its fuel sales. To allow companies or individuals to breach contracts on the basis of the opinions given by sub-cabinet officials before legislative committees would be in effect to make such opinions law. There is no such rule of law in existence, for it would not only be illegal but unconstitutional and could only lead to complete chaos.

It is therefore perfectly clear that this court has no alternative in the absence of a valid legal basis or a proper legal excuse by Texaco but to find that the anticipated restricting of gasoline and diesel fuel sales on the Ohio Turnpike amount to an abrogation of the Texaco-Turnpike contract.

Under the American system of jurisprudence a sovereign state may not arrogate to itself the power to arbitrarily and unilaterally abrogate a contract. Nor does this

court believe, *a fortiori*, can Texaco do so. See *The Trustees of Dartmouth College* v. *Woodward* (1819), 4 Wheat. 518, 4 L. Ed. 629.

This court further finds by clear and convincing evidence that there is no adequate remedy at law available to plaintiff.

The equities are clear. If, as has been found, the contract clearly imposes a duty to perform and there is irreparable injury, it would not be equitable for defendant to unilaterally determine whether, or to what extent, it will perform. A court may intervene to effect equity by enjoining defendant's limitation of performance.

"In an action seeking injunctive relief, the burden rests on plaintiff to make a case which commends itself to the conscience of a judge, sitting as chancellor, that the relief sought is just and equitable, and that in good conscience and upon application of equitable principles the injunction should be granted." *Gillen-Crow Pharmacies* v. *Mandzak* (1966), 5 Ohio St. 2d 201, 206.

Certainly this is the case here.

## CONCLUSION

This court therefore finds that the facts of this case, the applicable law and the interests of justice require that the Ohio Turnpike Commission be granted a preliminary injunction restraining Texaco from limiting, rationing or allocating its sales of gasoline and diesel fuel to its customers on the Ohio Turnpike pending final adjudication of the issues herein, and it is so ordered, effective immediately.

*Preliminary injunction granted.*