SEQUOIA VOTING SYSTEMS, INC.

v.

OHIO SECRETARY OF STATE.

Court of Claims of Ohio.

No. 2003–09017.

Decided Sept. 3, 2003.

8

Brian K. Murphy and Geoffrey J. Moul, for plaintiff.

Jim Petro, Attorney General, Randall W. Knutti and Darrell M. Pierre, Assistant Attorneys General, for defendant.

FRED J. SHOEMAKER, Judge.

## PROCEDURAL HISTORY

{¶ 1} On August 15, 2003, plaintiff Sequoia Voting Systems, Inc. ("Sequoia") filed a complaint and a motion for a temporary restraining order. Sequoia sought an order to enjoin defendant Ohio Secretary of State from issuing a Notice of Award under Request for Proposal ("RFP") No. SOS0428365 until Sequoia had had the opportunity to present its Best and Final Offer. Counsel for the Secretary of State having received notice thereof appeared and opposed the motion.

{¶ 2} Upon review of the motion, the verified complaint, the sworn affidavits, and the arguments of counsel, the court issued an order enjoining and restraining the Secretary of State from disclosing the names of the apparent successful vendor(s) and from issuing a Notice of Award under RFP No. SOS0428365 until such time as Sequoia had had an opportunity to present its Best and Final Offer.

{¶ 3} The case was set for an evidentiary hearing for a determination of Sequoia's motion for a preliminary and permanent injunction. The evidentiary hearing was conducted on August 22, 2003, and August 27, 2003. The motion is now before the court for determination.

## APPLICABLE LAW

{¶ 4} In determining whether to grant injunctive relief, Ohio courts generally apply the following factors:

{¶ 5} "(1) [T]he likelihood or probability of a plaintiff's success on the merits; (2) whether the issuance of the injunction will prevent irreparable harm to the plaintiff; (3) what injury to others will be caused by the granting of the injunction; and (4) whether the public interest will be served by the granting of the injunction." *Corbett v. Ohio Bldg. Auth.* (1993), 86 Ohio App.3d 44, 49, 619 N.E.2d 1145.

{¶ 6} An injury is irreparable when there could be no plain, adequate, and complete remedy at law for its occurrence and when any attempt at monetary restitution would be "impossible, difficult or incomplete." *Cleveland v. Cleveland Elec. Illum. Co.* (1996), 115 Ohio App.3d 1, 12, 684 N.E.2d 343, appeal dismissed (1997), 78 Ohio St.3d 1419, 676 N.E.2d 123, citing *Ohio Turnpike Comm. v. Texaco* (1973), 35 Ohio Misc. 99, 105, 64 O.O.2d 383, 297 N.E.2d 557.

{¶ 7} "[T]o prevail on a complaint seeking injunctive relief with respect to the award of a public contract, [the contractor] must prove by clear and convincing evidence that the award constituted an abuse of discretion and resulted in some tangible harm to the public in general, or to [the contractor] individually." *Cleveland Constr., Inc. v. Ohio Dept. of Adm. Serv., Gen. Serv. Adm.* (1997), 121 Ohio App.3d 372, 384, 700 N.E.2d 54. The term "abuse of discretion" connotes more than just an error of law; it exists where the court's attitude, as evidenced by its decision, was unreasonable, arbitrary or unconscionable. See *Dayton ex rel. Scandrick v. McGee* (1981), 67 Ohio St.2d 356, 21 O.O.3d 225, 423 N.E.2d 1095; *Cleveland Constr.*, supra.

## FACTUAL BACKGROUND

{¶ 8} At the core of this case is federal legislation known as Help America Vote Act ("HAVA"), which was enacted in 2002 in response to the problems which arose from the last presidential election. The stated purpose of the HAVA is to create and establish a federally funded program to facilitate the replacement of punch-card voting systems with a more accurate, secure, and user-friendly electronic voting system. As the chief elections officer in the state of Ohio, the Secretary of State has undertaken the responsibility for evaluating prospective vendors of electronic voting equipment in order to determine which vendors would be qualified to enter into contracts to supply voting equipment to any of Ohio's 88 counties. The Secretary of State elected to conduct such evaluation by soliciting a request for proposals from interested vendors. In so doing, the Secretary of State drafted and published RFP No. SOS0428365.

## DISCUSSION

{¶ 9} The parties have stipulated that the RFP constitutes the written agreement between the parties in this case and that the language of the RFP governs

this dispute. The parties also agree that certain portions of the RFP are of particular importance in resolving this dispute. For example, the RFP provides under the heading "Notice":

{¶ 10} "The following RFP is available for informational purposes and will be included as part of any contract with a vendor to provide Statewide Voting System(s) that meet federal guidelines contained in the Help America Vote Act of 2002 ('HAVA').

{¶ 11} "This RFP is intended to solicit proposals from vendors that wish to supply the State of Ohio with HAVA-compliant voting systems. The final contract will be dependent upon specific elements of the selected vendor's proposal and will contain at a minimum this RFP, written amendments to this RFP, the Contractor's Proposal, and written, authorized amendments to the Contractor's Proposal. It also includes any materials incorporated by reference in the above documents and any purchase orders and change orders issued under the Contract. * * *"

{¶ 12} Under the RFP, at page 9, the evaluation of vendors shall proceed as follows:

{¶ 13} "PART FOUR: EVALUATION OF PROPOSALS

{¶ 14} "Overview

{¶ 15} "A comprehensive, fair, and impartial evaluation of proposals received in response to this procurement effort will be conducted.

{¶ 16} "The evaluation will be conducted in four phases:

{¶ 17} "1. Phase 1: Evaluation of all mandatory requirements as listed below. The Offeror(s) proposals will not move to Phase 2 unless all of the following mandatory requirements are met:

"● Offeror(s) must demonstrate prior experience similar in scope to the State's requests

"● Offeror(s) must demonstrate a capacity for meeting the State's schedule and deadlines

"● Offeror(s) recommended voting system must comply with FEC standards

"● Offeror(s) recommended voting system must be ITA qualified

"● Offeror(s) recommended voting system must be certified in the State of Ohio."

{¶ 18} "2. Phase 2: Detailed review of the technical requirements detailed in Attachment 3 and Attachment 5 of this RFP. The evaluation of any technical proposal that is incomplete or one in which significant inconsistencies or inaccuracies have been identified will result in a reduction of the evaluation score and, at

the sole discretion of the Secretary of State, may not be allowed to advance to the next evaluation phase.

{¶ 19} "3. Phase 3: Evaluation of product demonstrations. Offeror(s) receiving an unsatisfactory rating will result in a reduced evaluation score and, at the sole discretion of the Secretary of State, may not be allowed to advance to the next evaluation phase.

{¶ 20} "4. Phase 4. Evaluation of cost proposals. Proposals that have advanced through the first three evaluation phases with an average rating equal to or higher than 'satisfactory,' will be evaluated based on cost.

{¶ 21} "Scoring of the Phase 1 mandatory requirements will be either 'reject' or 'accept.' Evaluations conducted during Phase 2 and Phase 3 will be done using a five-part scale * * *."

{¶ 22} It is undisputed that five of the ten vendors who entered the evaluation process were eliminated prior to the start of Phase 4. Sequoia was one of the five remaining vendors to enter Phase 4. The Phase 4 evaluation process is set forth at page 10 of the RFP as follows:

{¶ 23} "Phase 4 evaluations of the cost proposal, as previously noted, will be evaluated on the basis of the cost figures provided. The table below summarizes the four evaluation phases:

| Evaluation Phase | Percent of Overall Score |
|---|---|
| Phase 1: Mandatory requirement | Must meet to continue |
| Phase 2: Detailed review of technical requirements | 50% |
| Phase 3: Product demonstrations | 20% |
| Phase 4: Cost proposals | 30% |

{¶ 24} "Identification of Apparent Successful Vendor(s)

{¶ 25} "Subsequent to the opening of the sealed Cost Proposals, discussions may be conducted by the SOS with responsible Offerors whose submitted proposals are determined to be reasonably susceptible of being selected for award. Offerors shall be accorded fair and equal treatment with respect to any opportunity for discussion and revision of proposals; and such revisions may be permitted after submissions and prior to award for the purpose of obtaining Best and Final Offers.

{¶ 26} "In conducting any such discussions, there shall be no disclosure of any information derived from proposals submitted by competing Offerors. The SOS [Secretary of State] Contracting Officer shall conduct all such discussions.

{¶ 27} "Award shall be made to the responsible Offeror(s) whose proposal is (are) determined in writing to be the most advantageous, bringing 'best value' to

the State, taking into account all evaluation factors set forth in this RFP. No other factors or criteria shall be used in the evaluation. SOS reserves the right to reject any and all proposals submitted in response to this request.

{¶ 28} "Evaluation Organization

{¶ 29} "An evaluation committee made up of subject matter experts will judge the merit of the Technical Proposals. Proposals will be evaluated using the adjectival method. The contract awarded under this RFP will be made to the Offeror(s) presenting the best value to the State for this procurement."

{¶ 30} The primary players on the Secretary of State's negotiating team were Dana Walch, who was employed by the Office of the Secretary of State as a Director of Election Reform, and two independent contractors, consultant Tom Ligenza and project manager Nola Haug. Sequoia was represented during this process primarily by its Vice President and Midwest Regional Manager, Miles Weigold, and Peter McManemy, its Chief Financial Officer.

{¶ 31} The evidence establishes that Phase 4 of the evaluation process was divided into two separate "rounds." At the start of round one on July 21, 2003, the sealed bids of the five remaining vendors were opened. Walch, Haug, and McManemy testified at length regarding the discussions, meetings, and conference calls that took place after the sealed bids were opened. Based upon the testimony and other evidence submitted herein, the court finds that after the sealed bids were opened, all five bidders were asked to re-bid the project due to the differences in the formatting of the bids and the assumptions made by the bidders in formulating their bids. According to Ligenza, the variations in the bidding style for each bidder made it very difficult for the Secretary of State's negotiating team to compare the bids. The major problem with Sequoia's bid was that its unit price was based upon anticipated county volume rather than statewide volume, whereas the Secretary of State was seeking a single-unit price bid based upon total anticipated statewide volume.

{¶ 32} All five bidders re-bid the project as requested. Thereafter, on August 5, 2003, the Secretary of State's negotiating team held a meeting with each of the five vendors. At the meeting, each vendor was presented with a customized Round 1 Negotiations Workbook ("Workbook"). The Workbook was reviewed in its entirety in the August 5, 2003 meeting. The Workbook was drafted almost entirely by Tom Ligenza. Ligenza testified that in drafting the Workbook, he was guided primarily by a market analysis that his company had performed for the Secretary of State. Ligenza admitted that he had not read the entire RFP prior to drafting the Workbook.

{¶ 33} At page 6 of the Workbook, the following language appears as one of the "bullet-points" under the heading "Key Messages":

{¶ 34} "•  We have made decisions to keep this process fair:

{¶ 35} "– Any vendor which does not extend at least their best contracted pricing over the past 18 months to Ohio will be eliminated from consideration.

{¶ 36} "– If overall we find that the vendors' cost proposals are not competitive as they ought to be given market conditions, we may modify this process to an Online Auction 'Winner Take All' based upon lowest price solution."

{¶ 37} The Workbook also provides at page 25 under the heading "process Going Forward":

{¶ 38} "•  Please submit your responses to any open questions and your final bid (using the Cost Proposal Update Form) within 24 hours from the close of this meeting * * * to Dana Walch via email.

{¶ 39} "•  Plan to meet again with this team at Tuesday Aug, 12 for four hours.

{¶ 40} "•  This will be our final negotiations session so bring all your necessary decision makers with you.

{¶ 41} "•  Please submit your planned list of attendees, their titles and planned role in the negotiations to Dana Walch via email with in the next 24 hours."

{¶ 42} As a result of the August 5, 2003 meeting, it was learned that Sequoia's bid was still based on county volume rather than a statewide single-unit price and that the bid would have to be revised to conform to the desired format. Following the August 5, 2003 meeting, plaintiff submitted a revised bid with a statewide unit price.  The unit price contained in the revised bid was actually higher than the unit price in the previous bid.  Nevertheless, according to McManemy, the unit price in Sequoia's revised bid was lower than "the best contracted pricing over the past 18 months."  McManemy's testimony in this regard was not challenged.

{¶ 43} Thereafter, on August 7, 2003, a conference call to Sequoia was scheduled for 3:00 p.m. In an electronic-mail correspondence to Weigold, Walch explained that the purpose of the call was to ensure that the negotiating team had a clear understanding of Sequoia's bid.  This e-mail provided:

{¶ 44} "The attached spreadsheet contains our understanding of your best and final offer.  The figures were calculated based on the assumption that you would provide voting systems to the entire state.  We also made assumptions based on our understanding of the configuration requirements of your total solution, and that you would provide training for all poll workers.  It is our goal to arrive at a total cost of ownership (TCO) per unit.  The TCO must be the same regardless of the number of counties that choose your solution.  In order to insure that the

Secretary of State's Negotiating Team and Sequoia have a clear understanding, and are in agreement with the figures represented in the spreadsheet, we would like to verbally discuss it with you as soon as possible. We must have this conversation before 3:30 PM today. Please let me know, via email, the time, and number your [sic] would like me to call." There is no mention in the e-mail about vendor elimination or "critical decisions." According to Ligenza, the purpose for the conference call was to clarify that Sequoia's latest bid was a single, statewide, unit-price bid and to update Sequoia that the face-to-face meeting previously scheduled for August 12, 2003, had been moved up to August 11, 2003. Ligenza and Haug participated in the conference call with Weigold and McManemy; Walch briefly joined the conversation in the later stages. Sequoia's Senior Sales Representative, Michael Wilkinson, was present in Weigold's office during the conference call, but he did not participate.

{¶ 45} There is considerable dispute in the testimony regarding the substance of the discussions that took place during the one-half-hour conference call. Ligenza and Haug testified that Sequoia was informed that its bid was very high and that critical decisions were going to be made in a meeting with the Secretary of State scheduled for 5:00 p.m. that day. Haug testified that she did not specifically ask Sequoia to submit another bid, but that four other vendors did submit revised bids prior to the 5:00 p.m. meeting. According to Ligenza, he told Weigold that "if we are going to meet next week, we have a lot of work to do on your prices." Upon review, the court does not believe that such a conditional statement was made regarding the August 11, 2002 meeting.

{¶ 46} Based upon the 3:30 p.m. conference call, Weigold issued at 4:21 p.m. and 4:30 p.m. the following e-mail correspondences to his key employees:

{¶ 47} "All

{¶ 48} "Note, meeting is on Monday, not Tuesday as indicated in my prev memo!

{¶ 49} "Additionally, during conversation with SOS office today, they indicated they would 'have the spreadsheet projected on the wall' for review/discussion.

{¶ 50} "We fully expect they will 'squeeze hard' to get 'Total Cost of Owner-ship' pricing as low as possible. Formula is based on assumption that we will get the entire state, adds all prices together divided by total Case No. of units in the state. We should be prepared to be 'grilled hard' to reduce prices.

{¶ 51} "* * *

{¶ 52} "After discussions with the OH SOS office today, Sequoia has been invited back to the table' for BAFO [Best and Final Offers] on Monday, August 11th 8:00–12:00. During today's discussion, Peter and I were informed that this

date/time was selected 'to comply with Miles' request to go first instead of last' ....... blame me!"

{¶ 53} The members of the negotiating team who participated in the 5:00 p.m. meeting and testified at the hearing were, in the opinion of the court, deliberately vague and not completely forthright in relating the discussions which took place at the August 7, 2003 meeting. For example, neither Ligenza, Walch, nor Haug was able to remember who initiated discussions about vendor elimination. Walch did recall that the meeting was called by the Secretary of State himself, but Walch did not recall when the meeting was first scheduled. Nevertheless, the testimony establishes that a final score for each vendor was tallied at the August 7, 2003 meeting and that Sequoia and one other vendor were eliminated by a unanimous vote of the attendees, including the Secretary of State.

{¶ 54} On August 8, 2003, Weigold received a letter from Walch via e-mail, wherein Walch informed Sequoia that its proposal had been rejected due to excessive cost and that the meeting scheduled for August 11, 2003, was cancelled. The stated reason for the decision was that Sequoia's proposal "exceeds the budgeted funds for the project."

{¶ 55} Sequoia argues that the Secretary of State violated the express terms of the RFP and abused his discretion by prematurely eliminating Sequoia from the bidding process. Specifically, Sequoia contends that the RFP does not provide for the elimination of any Phase 4 vendors prior to the scheduled face-to-face negotiations, that plaintiff was unfairly eliminated from the process prior to the conclusion of Phase 4, and that other vendors were provided a greater opportunity to negotiate a final bid.

{¶ 56} Upon review of the entire RFP, the court does not find a single provision authorizing the Secretary of State to eliminate a vendor prior to the completion of Phase 4 of the evaluation process. The court finds, by clear and convincing evidence, that Phase 4 of the evaluation process was not to be completed until each of the vendors had an opportunity to negotiate its Best and Final Offer in a face-to-face meeting with the Secretary of State's negotiating team. The court is convinced that neither Sequoia's representatives nor the Secretary of State's negotiating team had any prior knowledge that vendors would be eliminated from the process at the August 7, 2003 meeting. Despite testimony from Haug and Walch that all bidders were cautioned that there were no guarantees they would all make it through Phase 4, the court finds that the language of the RFP and the Workbook drafted by Ligenza would lead any reasonable vendor in Sequoia's position to believe that the face-to-face meeting scheduled for the purpose of negotiating a best and final offer was a vital and necessary part of the Phase 4 evaluation process. Even Ligenza, Haug, and Walch had to admit that they did not become aware that vendors were going to

be eliminated until after the August 7, 2003 meeting commenced. If the primary players in the Secretary of State's negotiating team were unaware that vendor elimination would occur at the August 7, 2003 meeting, it follows that they could not have communicated this fact to Sequoia. Although Haug and Walch testified that Sequoia's bid was "very high" in comparison to the other bidders, both of these witnesses still considered Sequoia to be reasonably susceptible of being selected for award just prior to the meeting on August 7, 2003. It is also abundantly clear from the language used by Weigold in his August 7, 2003 e-mails that Sequoia fully expected the August 11, 2003 meeting to go forward as scheduled and that price negotiations would ensue.

{¶ 57} Phase 4 of the evaluation process requires fair and equal treatment of all vendors as stated in the RFP and the Workbook. The elimination of Sequoia from the bidding process at the August 7, 2003 meeting was unfair and inequitable and constitutes a breach of the agreement between the parties. The inequity of the Secretary of State's decision to eliminate Sequoia from the process is further demonstrated by the fact that the three remaining vendors who were permitted to negotiate with the Secretary of State in the face-to-face meeting were given an opportunity to lower their cost estimates and all three vendors, in fact, did so. Not only did these vendors have the opportunity to review their cost proposals with the negotiating team on a line-by-line, item-by-item basis, but they were also all given a "target range" within which to make a "Best and Final Offer." Sequoia was clearly expected to have the same opportunity and, under the terms of the RFP, it was entitled to that opportunity.

{¶ 58} Given the express purpose of the evaluation process, which is to identify the Apparent Successful Vendor(s) and to make an award to the vendor who presents the "best value" to the state, the Secretary of State's decision to eliminate Sequoia from the process, without notice and without first conducting face-to-face negotiations to obtain Sequoia's Best and Final Offer, is clearly unreasonable. The only benefit to the state from the early elimination of Sequoia that can be gleaned from the evidence is the additional time and effort the negotiating team saved by not having to conduct a four-hour negotiating session to obtain Sequoia's Best and Final Offer. In light of the tremendous time and effort the Secretary of State's Office had invested in the evaluation process through Phase 4, and the obvious care the Secretary of State's negotiating team had taken up to that point to assure fair and equitable treatment of all vendors, the incremental benefit derived by the state from saving a few hours time cannot possibly justify the actions taken by the Secretary of State in this case. Additionally, Sequoia's premature elimination for the stated reason that its cost estimate exceeded budgeted funds is a pretext, in light of subsequent negotiations that resulted in price concessions from all remaining vendors.

{¶ 59} The court finds that Sequoia's premature elimination from the bidding process will cause irreparable harm to Sequoia by depriving Sequoia of a fair and equal opportunity under the RFP to be selected as one of the Apparent Successful Vendors with whom the 88 counties in Ohio may contract for the purchase of electronic voting machines in an estimated $100,000,000 market. The court also finds that the relatively short delay necessary to ensure that Sequoia receives a fair and equitable opportunity to negotiate its Best and Final Offer is far outweighed by the potential harm to the public created by the premature elimination of a vendor who may provide the state of Ohio with the best value in this market. The court further finds that the damages to Sequoia in the form of lost profits should injunctive relief not be granted are so speculative and uncertain that they would be nearly impossible to calculate. Consequently, absent the injunctive relief requested, plaintiff has no adequate remedy at law.

## CONCLUSION

{¶ 60} For the foregoing reasons, the court finds by clear and convincing evidence that the Secretary of State abused his discretion by eliminating Sequoia from the evaluation process prior to the completion of Phase 4. Accordingly, it is the judgment of this court that an order shall issue permanently enjoining and restraining the Secretary of State from issuing a Notice of Award under RFP No. SOS0428365 until such time as Sequoia has a fair and equitable opportunity to complete Phase 4 of the evaluation process under the terms of the RFP and to negotiate its Best and Final Offer as required by the RFP.

Judgment accordingly.

FRED J. SHOEMAKER, J., retired, of the Franklin County Court of Common Pleas, sitting by assignment.